STATE OF NORTH CAROLINA v. JOSEPH EARL BATES

No. 145A91-2

(Filed 31 July 1996)

## 1. Homicide § 555 (NCI4th)— first-degree murder—proof of premeditation and deliberation—instruction on second-degree murder not required

The State's evidence satisfied its burden of proof on the elements of premeditation and deliberation in a prosecution for first-degree murder, and the trial court did not err in refusing to instruct the jury on second-degree murder, where the evidence tended to show that defendant beat the victim with a shovel handle, bound him with ropes, and placed him in defendant's vehicle; when defendant stopped at his employer's house, he told a friend that he had in his truck a person who might know something about who shot into defendant's house and asked if he wanted to "help or watch"; defendant then transported the victim to defendant's campsite, tied him to a tree, and questioned him at gunpoint; the victim was asking defendant what he had done and what was going on; after shooting the victim in the neck, defendant tied cement blocks to the victim's body and later threw the body over a bridge into a river; afterwards, defendant stated that what he had done did not bother him and that he could not let the victim go after what he had done to him; and defendant stated in his confession that he was not drunk or doing drugs at the time he shot the victim. Defendant's statements in his confession that the reason he shot the victim was because the victim acted like he knew who shot into his house, the victim spit on him and swore at him, and "this made me mad and I shot him" did not show a lack of premeditation and deliberation which required the trial court to instruct on second-degree murder.

**Am Jur 2d, Homicide §§ 496, 511.**

STATE v. BATES

[343 N.C. 564 (1996)]

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

**Propriety of lesser-included-offense charge to jury in federal criminal case—general principles. 100 ALR Fed. 481.**

**Propriety of lesser-included-offense charge to jury in federal homicide prosecution. 101 ALR Fed. 615.**

2. **Criminal Law § 1363 (NCI4th)— capital sentencing—nonstatutory mitigating circumstances—circumstances unlikely to recur—emotional fear—insufficient evidence**

The trial court did not err by refusing to submit to the jury in a capital sentencing proceeding defendant's proposed mitigating circumstances that his criminal conduct was the result of circumstances unlikely to recur and that he was suffering emotional fear at the time of the offense because he believed his life was in danger where no evidence in the record suggested that defendant's depression, personality disorder, or alcohol abuse were unlikely to recur, and there was insufficient evidence of the emotional fear circumstance where the victim was hog-tied and strapped to a tree at the time defendant shot and killed him.

**Am Jur 2d, Criminal Law § 628.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**Modern status of test of criminal responsibility—state cases. 9 ALR4th 526.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

3. **Criminal Law § 1363 (NCI4th)— capital sentencing—nonstatutory mitigating circumstances—influence of alcohol—subsumption by statutory circumstances submitted**

The trial court did not err by refusing to submit to the jury in a capital sentencing proceeding defendant's proposed mitigating circumstances that he was under the influence of alcohol at the time of the offense and that the influence of alcohol on defendant's life was significant where the proposed circumstances were subsumed by the statutory mental or emotional disturbance and

STATE v. BATES

[343 N.C. 564 (1996)]

impaired capacity mitigating circumstances submitted to the jury. N.C.G.S. §§ 15A-2000(f)(2), 15A-2000(f)(6).

**Am Jur 2d, Criminal Law § 628.**

**Modern status of the rules as to voluntary intoxication as defense to criminal charge. 8 ALR3d 1236.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**Effect of voluntary drug intoxication upon criminal responsibility. 73 ALR3d 98.**

4. **Criminal Law § 680 (NCI4th)— capital sentencing—nonstatutory mitigating circumstances—peremptory instructions not required**

The trial court did not err by refusing to give peremptory instructions on mitigating circumstances that defendant was one of seven children reared by poor, hardworking parents and he worked to help out the family while at home, and that before his marital problems, defendant was kind, friendly, and compassionate since the evidence relating to those circumstances was not uncontroverted.

**Am Jur 2d, Criminal Law § 628.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

5. **Criminal Law § 1339 (NCI4th)— capital sentencing—aggravating circumstances—heinous, atrocious, or cruel murder—murder while committing kidnapping—different evidence**

The same evidence was not used in a capital sentencing proceeding to support the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that the murder was committed while defendant was engaged in the commission of a felony (kidnapping) and the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel, even though the trial court instructed the jury that it must find defendant guilty of kidnapping the victim for the purpose of terrorizing him in order to find the (e)(5) circumstance, where (1) the evidence establish-

STATE v. BATES

[343 N.C. 564 (1996)]

ing the especially heinous, atrocious, or cruel circumstance con-
cerned the brutality of the murder in that it tended to show that
defendant hit the victim over the head several times with a shovel
handle; the victim suffered for hours before being killed; defend-
ant hog-tied the victim, laid the victim out on the ground, tied the
victim to a tree, and placed a gun to his throat while interrogating
him; and after beating and interrogating the victim at gunpoint for
several hours, defendant shot the victim in the neck, and (2) the
kidnapping was shown by evidence that defendant loaded the vic-
tim into his truck and took him to his employer's house, and the
purpose to terrorize the victim was shown by evidence that
defendant invited his employer and another person to participate
or watch him as he got answers from the victim, that defendant
had earlier expressed to a third person his intent to get answers
from the victim, and that defendant carried out this intent by
interrogating the victim at gunpoint.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty,
to establish statutory aggravating circumstance that mur-
der was heinous, cruel, depraved, or the like—post-*Gregg*
cases. 63 ALR4th 478.**

**Sufficiency of evidence, for death penalty purposes, to
establish statutory aggravating circumstance that murder
was committed in course of committing, attempting, or
fleeing from other offense, and the like—pose-*Gregg* cases.
67 ALR4th 887.**

**Validity of death penalty, under Federal Constitution,
as affected by consideration of aggravating or mitigating
circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

6. **Criminal Law § 1320 (NCI4th)— capital sentencing—two
aggravating circumstances—consideration of same evi-
dence prohibited—failure to instruct—no plain error**

The trial court did not commit plain error by failing to
instruct the jury that it could not consider the same evidence in
support of the (e)(5) aggravating circumstance that the murder
was committed while defendant was engaged in a kidnapping and
the (e)(9) aggravating circumstance that the murder was espe-
cially heinous, atrocious, or cruel in light of the strong evidence
in the case, including evidence of psychological torture, and the

fact that there was independent evidence supporting each aggravating circumstance.

**Am Jur 2d, Criminal Law § 628; Trial § 1441.**

**7. Criminal Law § 427 (NCI4th)— capital sentencing—prosecutor's argument—defendant's demeanor—no comment on failure to testify**

The prosecutor did not suggest that defendant should take the stand and improperly comment on defendant's failure to testify by her argument in a capital sentencing proceeding about defendant's lack of remorse and his absence of emotion when the victim's mother, defendant's mother, and his sister cried on the stand. Rather, the prosecutor was commenting on the demeanor of the defendant, which was before the jury at all times, and the trial court did not err by failing to intervene *ex mero motu.*

**Am Jur 2d, Trial §§ 577-587.**

**Violation of federal constitutional rule (*Griffin v. California*) prohibiting adverse comment by prosecutor or court upon accused's failure to testify, as constituting reversible or harmless error. 24 ALR3d 1093.**

**Failure to object to improper questions or comments as to defendant's pretrial silence or failure to testify as constituting waiver of right to complain of error—modern cases. 32 ALR4th 774.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**8. Jury § 132 (NCI4th)— voir dire—defendant's election not to testify—exclusion of question—no abuse of discretion**

The trial court did not unduly restrict defendant's *voir dire* of prospective jurors in a capital trial and thus did not abuse its discretion by sustaining an objection to one question to the jury panel regarding whether the prospective jurors would hold defendant's election not to testify against him where defendant did not exhaust his peremptory challenges; after the objection was sustained, defendant was allowed to ask other questions related to his election not to testify; and the trial court correctly

instructed the jury that defendant's decision not to testify could not be used against him.

**Am Jur 2d, Jury § 206.**

**Effect of accused's federal constitutional rights on scope of voir dire examination of prospective jurors—Supreme Court cases. 114 L. Ed. 2d 763.**

9. **Criminal Law § 463 (NCI4th)— capital sentencing—prosecutor's arguments—no gross impropriety**

The prosecutor's jury arguments in a capital sentencing proceeding that one of defendant's motives in killing the victim was to prevent the victim from testifying against him, that a picture of the victim showed that the victim had beautiful hands and "we had to cut them off to find out who he was," and that the jury could imagine the devastation suffered by the victim's mother when a law officer knocked on her door were not so grossly improper as to have required intervention *ex mero motu* by the trial court.

**Am Jur 2d, Trial § 554.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

10. **Evidence and Witnesses § 1240 (NCI4th)— prearrest statements at police station—defendant not in custody—Miranda warnings not required**

Defendant was not in custody at the time he made three prearrest statements to law officers so that *Miranda* warnings were not required and those statements thus did not taint a subsequent statement made by defendant after he had been given the *Miranda* warnings where the trial court made findings supported by evidence that the defendant agreed to talk with law enforcement officers and agreed to go to the Sheriff's Department; defendant drove to the Sheriff's Department, accompanied by a friend; when defendant arrived, he spoke with three law enforcement officers; the officers thanked defendant for coming to the Sheriff's Department and told defendant that he was not under arrest and was free to leave at any time; the officers spoke to defendant for approximately forty minutes, during which time

defendant told three different stories about what happened on the night in question; thereafter, defendant went to the bathroom alone; after defendant returned from the bathroom, the officers asked defendant if he would tell the truth, and defendant said that he would; defendant was then advised of his *Miranda* rights, and defendant signed a written waiver of those rights; and defendant was given a drink and cigarettes throughout the interview.

**Am Jur 2d, Criminal Law §§ 788 et seq.; Evidence § 749.**

**What constitutes "custodial interrogation" within rule of *Miranda v. Arizona* requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

**11. Jury § 142 (NCI4th)— voir dire—hypothetical question— improper attempt to stake our jurors**

The trial court did not err in refusing to permit defendant to ask prospective jurors in a capital trial whether, if they thought all the evidence and all the factors supported voting for life imprisonment, they would vote for life imprisonment even if eleven other jurors felt that death was appropriate since the question attempted to place jurors in a hypothetical situation of being deadlocked eleven to one and to stake out jurors to a certain position.

**Am Jur 2d, Jury §§ 208, 209.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**12. Evidence and Witnesses § 1695 (NCI4th)— photographs of decomposed body—admissibility for illustrative purposes**

The trial court did not violate defendant's due process rights to a fair trial and a reliable sentencing proceeding by allowing the State to introduce a number of photographs of a murder victim's hog-tied body in a state of advanced decomposition, including photographs taken after the victim's body was retrieved from a river and at the autopsy, since the photographs were admissible to illustrate a pathologist's testimony with regard to the condition of the victim's body when found and the wounds it had sustained.

**Am Jur 2d, Homicide §§ 416 et seq.**

STATE v. BATES

[343 N.C. 564 (1996)]

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

13. **Jury § 257 (NCI4th)— peremptory challenges of women— gender discrimination—prima facie case not shown**

The prosecutor's exercise of eight of twelve peremptory challenges against women, standing alone, was insufficient to establish a *prima facie* case of gender discrimination in this capital trial.

**Am Jur 2d, Jury § 245; Criminal Law § 683.**

**Exclusion of women from grand or trial jury panel in criminal case as violation of constitutional rights of accused or as ground for reversal of conviction. 9 ALR2d 661.**

**Sex discrimination in jury selection—Supreme Court cases. 128 L. Ed. 2d 919.**

14. **Jury § 153 (NCI4th)— capital trial—jury selection—prosecutor's question and argument—ability to return death penalty "without hesitation"—no gross impropriety**

Defendant's due process rights were not violated, and there was no gross impropriety requiring the trial court to intervene *ex mero motu*, when the prosecutor asked prospective jurors whether, if they determined the death penalty to be appropriate, they could recommend a sentence of death "without hesitation" and argued this pledge to the jury, since a reasonable interpretation of the prosecutor's question is whether each juror could recommend the death penalty if he or she found that the aggravating circumstances outweighed the mitigating circumstances, and the prosecutor's argument was intended only to remind jurors of their duty during the capital sentencing proceeding to recommend a sentence of death if the evidence supported this recommendation.

**Am Jur 2d, Jury § 199.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**15. Criminal Law § 1309 (NCI4th)— capital sentencing—cross-examination of defendant's mother—bad act by defendant—no abuse of discretion**

The trial court did not abuse its discretion in allowing the prosecutor to ask defendant's mother on cross-examination in a capital sentencing proceeding if she was aware that defendant had broken his wife's arm where there was no contention that the question was asked in bad faith.

**Am Jur 2d, Trial § 500.**

**16. Criminal Law § 1373 (NCI4th)— death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate to the penalty imposed in similar cases where the jury found defendant guilty under the theory of malice, premeditation, and deliberation and also under the felony murder rule; the jury found as aggravating circumstances that the murder was committed while defendant was engaged in the commission of a kidnapping and that it was especially heinous, atrocious, or cruel; defendant bound the victim's arms and legs behind his back, tied him to a tree, and tortured him for several hours before finally shooting him in the neck; defendant did not seek medical attention for the victim; and defendant threw the victim's bound body into a river after removing two cement blocks he had tied around the victim's neck because he could not lift the body with the cement blocks tied to it.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Rousseau, J., at the 31 October 1994 Criminal Session of Superior Court, Yadkin County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 11 April 1996.

## STATE v. BATES

[343 N.C. 564 (1996)]

*Michael F. Easley, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.*

*W. David Lloyd for defendant-appellant.*

FRYE, Justice.

Defendant, Joseph Earl Bates, was indicted on 29 October 1990 for the murder and the first-degree kidnapping of Charles Edwin Jenkins. He was tried capitally in February 1991, found guilty of one count of first-degree murder and one count of first-degree kidnapping, and sentenced to death for the first-degree murder conviction. On appeal, we awarded defendant a new trial. *State v. Bates,* 333 N.C. 523, 428 S.E.2d 693, *cert. denied,* 510 U.S. 984, 126 L. Ed. 2d 438 (1993). During defendant's second capital trial, the jury returned verdicts of guilty of one count of first-degree kidnapping and guilty of one count of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. During a capital sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of death for the first-degree murder conviction. The jury found as aggravating circumstances that the murder was committed while defendant was engaged in the commission of a kidnapping, N.C.G.S. § 15A-2000(e)(5) (1988); and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9) (1988). The jury also found seven of the seventeen statutory and nonstatutory mitigating circumstances submitted to it. On 9 November 1994, Judge Rousseau sentenced defendant to forty years in prison for his first-degree kidnapping conviction, and upon the jury's recommendation, he imposed a sentence of death for defendant's first-degree murder conviction.

Defendant appeals to this Court as of right from the first-degree murder conviction; he does not appeal the kidnapping conviction. Defendant makes twenty-four arguments on appeal, supported by thirty-one assignments of error. We reject each of these arguments and conclude that defendant's trial and capital sentencing proceeding were free of prejudicial error and that the death sentence is not disproportionate. Accordingly, we uphold defendant's conviction of first-degree murder and his sentence of death.

The State's evidence presented at trial tended to show the following facts and circumstances: At approximately 9:30 p.m. on 10 August 1990, defendant spoke with Hal Eddleman, his employer, inside defendant's tent, which was located on Eddleman's land.

Eddleman allowed defendant to set up a campsite on his property after someone had broken into and fired gunshots into defendant's house. Defendant told Eddleman, "There's something going down at [the] Donnaha [bridge]. This guy got in touch with me, and told me to meet him over at Donnaha, we'd get it over with." As a result of this conversation, at approximately 11:30 p.m. on 10 August 1990, Eddleman and his wife went to the Donnaha bridge, which extends across the Yadkin River. They remained there for approximately two to two and one-half hours. After seeing no one, they returned home and went to bed.

At around 9:00 or 9:30 p.m. on 11 August 1990, defendant and Gary Shaver went to LaDan's Night Club. Janette Turner, a part-time waitress at LaDan's, and Billy Grimes, Turner's boyfriend and defendant's friend, were also at LaDan's that night. Grimes left LaDan's at around 12:30 or 1:00 a.m. on 12 August 1990. Grimes and Turner planned to meet at Bran's Game Room at the end of Turner's shift. At about 1:45 a.m., defendant asked Turner to ask Grimes to telephone Eddleman and said that Grimes and Eddleman would know what was going on. When Turner left LaDan's at around 2:00 or 2:30 a.m., she went to Bran's to meet Grimes. When she arrived at Bran's, Turner relayed defendant's message to Grimes.

Grimes testified at trial that when Turner relayed defendant's message to telephone Eddleman and tell him that something was "going down" and that they knew what it was all about, he did not know what it was all about. Nonetheless, Grimes and Turner left Bran's and went to the Pineview Restaurant, where Grimes telephoned Eddleman from an outside pay telephone. Grimes apologized for waking Eddleman and relayed defendant's message to him. Grimes said, "[Defendant] wanted me to call you and tell you there's something going down and he wants to know if you want anything to do with it." Eddleman said, "Well, I went to the river last night and spent about two and a half, maybe three hours. Nothing didn't happen then. Hell, no, I don't want nothing to do with it." Eddleman then went back to sleep. Grimes and Turner returned to Bran's and departed in their separate vehicles.

Meanwhile, at approximately 2:00 a.m., the victim, Charles Edwin Jenkins, asked defendant for a ride home. The victim left LaDan's with defendant and Shaver. During the ride, defendant asked the victim whether he knew defendant's ex-wife, Lisa Bates, or her boyfriend, Jeff Goins. The victim responded, "Yeah, isn't Lisa the one

that has big breasts" and "long blond hair." According to Shaver's testimony at trial, although defendant's ex-wife had long blond hair at that time, she did not have "big breasts."

During the ride, defendant stopped twice. The first time, he stopped for fifteen or twenty minutes along the side of the road in Iredell County so that defendant and Shaver could "use the bathroom." The victim did not exit the vehicle at this time. After driving for about fifteen or twenty minutes more, defendant stopped the vehicle a second time. This time, the victim and Shaver got out of defendant's vehicle to "use the bathroom." Shaver was standing on the passenger side of the vehicle, and the victim was standing at the rear of the vehicle. Defendant exited the vehicle, went around to the rear of the vehicle, and struck the victim at least three times on the back of the head with a shovel handle that had been in the vehicle. The victim fell to the ground. Defendant then gave the handle to Shaver, took some rope from the vehicle, and tied the victim's hands. The victim appeared to be unconscious at this point. However, the victim started moaning, and defendant told Shaver to hit the victim with the shovel handle. Shaver refused so defendant took the handle from Shaver and struck the victim on the back of the head again. The victim stopped moaning and again appeared to be unconscious. Defendant then bound the victim's arms and legs behind his back, or hog-tied him.

Defendant asked Shaver to help him place the victim into defendant's vehicle, and Shaver did so. Defendant then told Shaver that he believed that the victim was one of the persons who had been "messing around his house and stuff." Defendant said that he was "going to find out some answers." Defendant believed that the persons who had shot into his house were friends of his ex-wife and her boyfriend, and he thought the victim was setting him up and leading him into a trap.

Defendant and Shaver got into the truck and headed towards defendant's campsite. Defendant was driving, Shaver was in the passenger seat, and the victim was hog-tied and lying on the floor of the rear of the vehicle. At some point, the victim propped his head up, and defendant asked him for directions. The victim responded that he could not see because his glasses had been lost. The victim then asked defendant what he had done and what was going on. Defendant told the victim to shut up. About fifteen or twenty minutes later, defendant noticed a sign indicating that they were entering Yadkin County. Defendant proceeded towards his campsite.

On the way back to his campsite, defendant stopped at Eddleman's house. Defendant and Shaver exited the vehicle. Defendant knocked on the front door and entered Eddleman's house; Shaver waited outside in front of defendant's vehicle. Defendant remained inside the house for fifteen or twenty minutes. While inside Eddleman's house, defendant told Eddleman, "We got one of the MF's." Eddleman asked, "Who is he?" Defendant said, "His name is Chuck." Eddleman asked, "How do you know he's one of them?" Defendant said, "He's told us." Eddleman asked, "Where's he at?" Defendant responded, "He's hogtied in the jeep. You want to see him?" Eddleman said, "No, the best thing you can do is take him back where you got him, apologize to him and do anything he wants you to do, and hope that he don't prosecute you for kidnapping him." Defendant and Eddleman then stepped out onto the porch.

While defendant and Eddleman were outside on the porch talking, Billy Grimes drove up in his white Mitsubishi pickup truck and parked behind defendant's vehicle. Defendant walked up to Grimes' pickup truck and spoke with Grimes. According to Grimes, defendant said, "I've got one of the guys that's been messing with me. Do you want to watch or help?" Grimes declined, left, and went home.

Meanwhile, Eddleman had stepped off the porch to talk with Shaver. Eddleman said to Shaver, "Gary, you don't want nothing to do with this either." Eddleman also told Shaver, "Gary, you better talk to [defendant]." Eddleman then said to defendant, "Joe, you better listen." Defendant then walked over to Shaver and told him that he could get out of the situation if he wished. Shaver stated that he wanted out because he had sole custody of his daughter and did not want to jeopardize his custody. Defendant told Shaver that he would take Shaver back to his vehicle, which was parked at defendant's campsite. Defendant and Shaver then got back into defendant's vehicle and left. When they arrived at defendant's campsite, Shaver got into his vehicle and left. The victim was alive at this time. Shaver went home, set his alarm clock, and went to bed. It was approximately 4:00 a.m. at this time.

Defendant returned to Eddleman's house later that morning and again awoke Eddleman. It was still dark outside. Defendant returned Eddleman's gun, which he had borrowed at some time earlier. Eddleman took the gun and placed it in one of his bedrooms in his house. Defendant asked Eddleman, "What do you think I should do with the body?" Eddleman said, "What?" Defendant repeated the

question. Eddleman said, "Man, if you've got a body, you've only got about three choices. You either take him to the sheriff's office, bury him or throw him in the river." After some further conversation, defendant asked, "Do you reckon I should tie cement blocks to him?" Eddleman answered, "If you do, or not, he will come up in from nine to eleven days." Defendant then said, "I guess I can load him by myself," and he left.

Eddleman went back to bed and awoke at 9:30 or 9:45 a.m. that morning. Eddleman went to look at the gun to determine whether there was blood on it. He discovered what appeared to be flesh and blood on the gun. He then cleaned the gun.

Later that day, Eddleman spoke with defendant. During the conversation, defendant said, "I was just thinking about what happened last night." Eddleman said, "Man, you better quit thinking. You're going to have a hard enough day as it is." Defendant said, "Well, it don't bother me all that bad." Eddleman responded, "It will." When defendant left Eddleman's house, he packed up his tent and left the campsite.

Grimes saw defendant at about noon that day. Defendant was at defendant's home unloading his vehicle. Defendant was placing his tent and the other items from his campsite into his residence. Grimes noticed that there was blood all over the contents of defendant's vehicle. Defendant took some items inside his house and washed the blood off in the sink. Grimes remained at defendant's house for about thirty minutes.

Grimes again saw defendant later that day at Bran's Game Room. Defendant told Grimes that he shot the victim through the neck and threw his body into the river. Grimes asked defendant why he killed the victim, and defendant said that he could not let him live after what defendant had done to the victim and that he would get just as much time for murder as he would for kidnapping.

A couple of days later, Shaver saw defendant at Eddleman's house. Shaver asked defendant what happened, and defendant said that it was best if Shaver did not know. A few days before, defendant had told Shaver that he thought he could kill someone.

On 25 August 1990, two fishermen discovered the victim's body floating in the Yadkin River and contacted the police. The victim's ankles and wrists were bound by rope, his legs and arms were pulled backwards behind his back and tied together, and a rope

was tied around his neck. The victim's body was in an early stage of decomposition. His belt buckle was undone, and his pants were unzipped.

On 26 August 1990, an autopsy was performed on the victim's body. The medical examiner noted that the victim's wrists and ankles had been bound together with rope and that his arms and legs had been fastened behind his back in a "hogtie" configuration. There was also a loop of rope around the victim's neck and a separate rope around his knee area. The medical examiner further noted that there was considerable decomposition of the body. He discovered a gunshot wound to the back of the victim's neck. The medical examiner was unable to testify with any degree of medical certainty whether the victim experienced any pain as a result of the gunshot wound but testified that the victim could have died instantaneously.

Prior to the autopsy, police officers took fingerprints from the victim to establish his identity. Because the State Bureau of Investigation (SBI) was unable to determine his identity from these prints, the victim's hands were surgically removed and turned over to an agent of the SBI so that they could be processed and better fingerprints obtained. The SBI processed the fingerprints they obtained from the hands and determined that the victim was Charles Edwin Jenkins.

On 30 August 1990, while investigating the victim's murder, two law enforcement officers went to defendant's house and spoke with him. Before leaving the residence, they asked defendant's permission to search his vehicle. Defendant gave them permission and assisted them into the vehicle. One of the officers found a newspaper on the floor of defendant's vehicle. The newspaper had a front-page story about the officer's uncle, so he asked defendant if he could have the newspaper. Defendant agreed to let him have it. Inside the newspaper, the officer found a receipt that had what appeared to be bloodstains on it. The officers also asked defendant's permission to have a small piece of rope that was in a bucket on defendant's front porch. Defendant allowed the officers to take the rope. Also, a piece of molding containing what appeared to be blood was taken from defendant's vehicle. The receipt and the molding were examined by the SBI, and the substance on them was determined to be blood. However, no useable fingerprints were taken from the molding, and no determination could be made as to whether the blood matched the victim's blood since the victim's body contained no blood when it was found.

On 31 August 1990, defendant gave a thirteen-page confession to the police in which he admitted beating the victim, binding him with ropes, kidnapping him, tying him to a tree, and questioning him at gunpoint. Defendant also admitted shooting the victim in the neck after the victim would not tell him who had shot into his house and after the victim had spat on him. Defendant further admitted tying a cement block around the victim's neck, removing the cement block when he discovered it made the body too heavy to throw off the bridge, and throwing the victim's hog-tied body into the Yadkin River.

Defendant did not testify at trial. However, defendant presented the testimony of two witnesses, Eddleman's wife and Eddleman's daughter-in-law, which tended to show that Shaver's vehicle was parked at defendant's campsite until 6:00 or 7:00 a.m. on the morning of the victim's death.

Defendant's motions to dismiss, made at the close of the State's evidence and again at the close of all the evidence, were denied.

[1] In his first argument, defendant contends that the trial court committed reversible error in denying his request for an instruction on second-degree murder since this is a case of conflicting evidence. We disagree.

In *State v. Conaway*, 339 N.C. 487, 453 S.E.2d 824, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 153 (1995), we said:

The test for determining whether the jury must be instructed on second-degree murder is whether there is any evidence in the record which would support a verdict of second-degree murder. *State v. Strickland*, 307 N.C. 274, 285, 298 S.E.2d 645, 653 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). " 'It is unquestioned that the trial judge must instruct the jury as to a lesser-included offense of the crime charged, when there is evidence from which the jury could find that the defendant committed the lesser offense.' " *State v. Conner*, 335 N.C. 618, 635, 440 S.E.2d 826, 835 (1994) (quoting *State v. Redfern*, 291 N.C. 319, 321, 230 S.E.2d 152, 153 (1976), *overruled in part on other grounds by State v. Collins*, 334 N.C. 54, 431 S.E.2d 188 [(1993)]). However, if the State's evidence is sufficient to satisfy its burden of proving each element of first-degree murder, including premeditation and deliberation, and there is no evidence other than defendant's denial that he committed the crime to negate these elements, the trial court should

not instruct the jury on second-degree murder. *Id.* at 634-35, 440 S.E.2d .at 835 (citing *State v. Strickland,* 307 N.C. at 293, 298 S.E.2d at 658).

*Conaway,* 339 N.C. at 514, 453 S.E.2d at 841.

The evidence in this case supports all the elements of first-degree murder, including premeditation and deliberation. Premeditation requires the act to have been thought out beforehand for some period of time, no matter how brief. *Conner,* 335 N.C. at 635, 440 S.E.2d at 836; *State v. Myers,* 299 N.C. 671, 677, 263 S.E.2d 768, 772 (1980). Deliberation requires that the defendant have the intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose, and not under the influence of a violent passion, suddenly aroused by a lawful or just cause or legal provocation. *Conner,* 335 N.C. at 635, 440 S.E.2d at 836; *State v. Hamlet,* 312 N.C. 162, 170, 321 S.E.2d 837, 842-43 (1984).

In the instant case, defendant argues that there was conflicting evidence about premeditation and deliberation. In his confession, defendant said, "The exact reason I shot [the victim] was because he acted like he knew who shot into my house. He spit on me and told me to go to hell. *And this made me mad and I shot him.*" (Emphasis added). At trial, Billy Grimes testified that defendant told him that defendant shot the victim because defendant could not let the victim live after what defendant had done to the victim. Defendant argues that this evidence is conflicting as to the element of premeditation and deliberation in that defendant's confession permits an inference that defendant acted under a suddenly aroused violent passion.

We conclude, however, that there was no evidence presented at trial to support an instruction on second-degree murder. We note that the evidence presented at trial showed that defendant asked Janette Turner to tell Billy Grimes to call Hal Eddleman and to tell Eddleman that something was "going down" the night of the murder; that when Grimes was on his way home that night, he went by Eddleman's house and saw defendant's vehicle in Eddleman's front yard; that defendant told Grimes that defendant "had one of the guys that was watching [defendant] or doing something[] in the truck"; that defendant asked Grimes if he wanted to "help or watch"; that Grimes said, "No," and then left; that defendant beat the victim with a shovel handle, bound him with ropes, transported him to defendant's campsite, and tied him to a tree; that defendant questioned the victim at gunpoint; that the victim was asking defendant what he had done and what was

going on; and that the victim was purposely not allowed to escape the danger. We note further that after shooting the victim in the neck, defendant tied cement blocks to the victim's body and later threw the body over the bridge into the Yadkin River. Afterwards, defendant stated that what he had done did not bother him and that he could not let the victim go after what he had done to him. Additionally, defendant stated in his statement to the police: "I was not drunk or doing drugs at the time. I knew what was going on." We conclude that this evidence was sufficient to satisfy the State's burden of proof on the element of premeditation and deliberation. Since there was no evidence presented at trial to sustain a verdict of defendant's guilt of second-degree murder, we reject defendant's first argument.

In his second argument, defendant contends that the trial court erred in refusing to submit four nonstatutory mitigating circumstances to the jury. The four nonstatutory mitigating circumstances requested in writing by defendant but not submitted to the jury by the trial court were (1) that the defendant's criminal conduct was the result of circumstances unlikely to recur, (2) that the defendant was under the influence of alcohol, (3) that the defendant was functioning under the belief that his life was in danger at the time of the commission of the crime, and (4) that the influence of alcohol on defendant's life had been significant.

Defendant's expert witness, Dr. John Warren, a psychologist, testified that defendant believed he was being plotted against and that defendant booby-trapped his trailer and then moved out of the trailer into a campsite. Dr. Warren also testified that defendant had started drinking at an early age and that this had stunted defendant's personality growth. Defendant contends that the proposed mitigating circumstances would have focused the jury's attention on defendant's mental problems in a way that was more mitigating than the statutory mitigating circumstance that defendant was under the influence of a mental or emotional disturbance. Defendant's argument appears to be rooted in the notion that the jury would have been more impressed with the mitigating value of the proffered evidence if it had been categorized into four separate mitigating circumstances rather than consolidated into a statutory mitigating circumstance and the "catchall" circumstance. Defendant contends that the failure to submit the four nonstatutory mitigating circumstances separately on the Issues and Recommendation as to Punishment form given to the jury during the capital sentencing proceeding was prejudicial error. We disagree.

In *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), we said:

In order for defendant to succeed on this assignment, he must establish that (1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2) there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury. Upon such showing by the defendant, the failure by the trial judge to submit such nonstatutory mitigating circumstance to the jury for its determination raises federal constitutional issues.

*Id.* at 325, 372 S.E.2d at 521 (footnote omitted). Further, we said that where the proposed mitigating circumstance is subsumed in the other mitigating circumstances submitted to the jury, the refusal of the trial court to submit the proposed circumstance is not error. *Id.* at 327, 372 S.E.2d at 522.

[2] Bearing these principles in mind, we turn to consider the trial court's failure to submit to the jury the four nonstatutory mitigating circumstances at issue in this case. The record shows that defendant failed to produce sufficient evidence to support the proposed mitigating circumstances that defendant's criminal conduct was the result of circumstances unlikely to recur and that, at the time of the offense, defendant was suffering emotional fear because he believed his life was in danger. As to whether defendant's criminal conduct was the result of circumstances unlikely to recur, there is no evidence in the record that suggests defendant's depression, personality disorder, or alcohol abuse were unlikely to recur. As to whether defendant was suffering emotional fear, we find unpersuasive defendant's argument that this fear need not be grounded in fact. Since the victim was hog-tied and strapped to a tree at the time that defendant shot and killed him, we are not convinced that there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury. Therefore, we conclude that the trial court did not err in refusing to submit these proposed mitigating circumstances to the jury.

[3] With respect to the trial court's refusal to submit to the jury defendant's proposed mitigating circumstances that defendant was under the influence of alcohol at the time of the crimes and that the influence of alcohol on defendant's life was significant, we conclude that the trial court did not err. The trial judge submitted as mitigating circumstances that the murder was committed while defendant was mentally or emotionally disturbed, N.C.G.S. § 15A-2000(f)(2); and that defendant's capacity to appreciate the criminality of his conduct or to

conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6). We note that the trial judge instructed the jury that it could find the (f)(2) mitigating circumstance if "the defendant suffered from major depression or alcoholism abuse or personal disorder [a]nd, that as a result, the defendant was under the influence of a mental or emotional disturbance when he killed [the victim]." We further note that the trial court also submitted the (f)(9) catchall mitigating circumstance. Since the proposed mitigating circumstances were subsumed in these statutory mitigating circumstances which were submitted to the jury, we reject defendant's second argument.

In his third argument, defendant contends that the trial court erred by not peremptorily instructing the jury on the mitigating circumstances which he claims were uncontroverted. Defendant submitted a general request for a peremptory instruction as to all mitigating circumstances. There was no separate request as to each. The mitigating circumstances submitted to the jury were composed of four statutory circumstances, twelve nonstatutory circumstances, and the catchall circumstance. The trial court did not give peremptory instructions on five of the nonstatutory mitigating circumstances.

[4] Defendant argues that the trial court erred in not giving peremptory instructions on the mitigating circumstances that defendant has below average mental ability; that defendant was a loving and caring son; that defendant was a loving and caring brother; that defendant was one of seven children reared by poor, hardworking parents, and he worked to help out the family while at home; and that before his marital problems, defendant was kind, friendly, and compassionate.

As to the mitigating circumstances that defendant was a loving and caring son and brother, defendant acknowledged with commendable candor during oral arguments that, although Judge Rousseau denied his request to give a peremptory instruction, he did instruct the jury peremptorily during the jury charge. With respect to the other nonstatutory mitigating circumstances submitted to the jury, after reviewing the transcripts, record, and briefs, we conclude that it was not error for the trial court to refuse to peremptorily instruct the jury since the evidence relating to these circumstances was not uncontroverted. *See State v. Gay*, 334 N.C. 840, 434 S.E.2d 467 (1993) (trial court required to give peremptory instruction, if defendant so requests, when evidence showing that mitigating circumstance

exists is uncontroverted). Accordingly, we reject defendant's third argument.

**[5]** In his fourth argument, defendant contends that the trial court erred in submitting to the jury two aggravating circumstances which he claims constituted impermissible and unconstitutional duplication in the evidence of aggravation. Defendant was convicted of first-degree murder based on premeditation and deliberation and under the felony murder rule. During the capital sentencing proceeding, the trial court submitted to the jury the following aggravating circumstances:

(1) Was this murder committed by the defendant while the defendant was engaged in the commission of kidnapping?

ANSWER: _____

(2) Was this murder especially heinous, atrocious or cruel?

ANSWER: _____

The jury answered both of these questions "Yes."

The crux of defendant's argument is that all the evidence supporting the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that the murder was committed while defendant was engaged in the commission of a felony (kidnapping) was subsumed by the evidence supporting the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel. Defendant notes that the trial court instructed the jurors that in order to find the (e)(5) aggravating circumstance, they must find defendant guilty of kidnapping the victim for the purpose of terrorizing him. Thus, defendant argues that, by necessity, the jury must have used the same evidence to determine the (e)(5) and (e)(9) aggravating circumstances. We disagree.

In a capital case, it is error to submit multiple aggravating circumstances supported by precisely the same evidence. *State v. Quesinberry*, 319 N.C. 228, 239, 354 S.E.2d 446, 453 (1987). Where, however, there is separate evidence supporting each aggravating circumstance, the trial court may submit both "even though the evidence supporting each may overlap." *Gay*, 334 N.C. at 495, 434 S.E.2d at 856.

As to the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, we have stated that it is appropriate when the level of brutality involved exceeds that normally found

in first-degree murders or when the murder in question is conscienceless, pitiless, or unnecessarily torturous to the victim. *State v. Hamlet,* 312 N.C. 162, 174-75, 321 S.E.2d 837, 845-46; *State v. Goodman,* 298 N.C. 1, 24-25, 257 S.E.2d 569, 585 (1979). It also arises when the killing demonstrates an unusual depravity of mind on the part of the defendant. *State v. Stanley,* 310 N.C. 332, 345, 312 S.E.2d 393, 401 (1984). Among the types of murders that meet the above criteria are those that are physically agonizing or otherwise dehumanizing to the victim and those that are less violent but involve the infliction of psychological torture. *State v. Oliver,* 309 N.C. 326, 346, 307 S.E.2d 304, 318 (1983).

In the instant case, evidence establishing the circumstance that the crime was especially heinous, atrocious, or cruel concerned the brutality of the murder: Defendant hit the victim over the head several times with a shovel handle. The victim suffered for hours before being killed. Defendant hog-tied the victim, laid the victim out on the ground, tied the victim to a tree, and placed a gun to his throat while interrogating him. After beating and interrogating the victim at gunpoint for several hours, defendant shot the victim in the neck. This is clearly enough evidence to establish that the murder was especially heinous, atrocious, or cruel.

None of this evidence, however, was necessary to establish the kidnapping used for the aggravating circumstance that the murder was committed during the course of a felony, and there was substantial other evidence supporting that circumstance. We first note that the crime of kidnapping requires that the defendant "unlawfully confine, restrain, *or* remove from one place to another" the victim. N.C.G.S. § 14-39(a) (1993) (emphasis added). Thus, in the instant case, the evidence supporting the kidnapping was that defendant loaded the victim onto his truck and took him to Eddleman's house. The purpose of the kidnapping—to terrorize the victim—is shown by the evidence that defendant invited Eddleman and Grimes to participate or watch him as he got answers from the victim. Additionally, defendant had earlier expressed to Shaver his intent to get answers, and he carried out this intent by interrogating the victim at gunpoint. Thus, we conclude that there was independent evidence supporting each of these aggravating circumstances. Accordingly, we reject defendant's fourth argument.

[6] In his fifth argument, defendant contends that the trial court erred in not instructing the jury that it could not consider the same

evidence in support of the (e)(5) and (e)(9) aggravating circumstances. Defendant concedes, however, that he did not request such an instruction and that our review is therefore limited to review for plain error, which requires defendant to show that the error was so fundamental that another result would probably have obtained absent the error. *See State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 378 (1983). In light of the strong evidence in this case, including evidence of psychological torture, and the fact that there was independent evidence supporting each aggravating circumstance, defendant has not shown that any error likely affected the outcome of his capital sentencing proceeding. Accordingly, we reject defendant's fifth argument.

[7]　In his sixth argument, defendant contends that the trial court erred during the prosecutor's closing argument by its failure to intervene *ex mero motu* and rectify improprieties to which defendant failed to object. Defendant argues that the prosecutor's closing argument to the jury violated his rights to silence and to due process by drawing attention to his decision not to testify.

During the sentencing phase arguments, the prosecutor argued:

Have you heard any evidence at all the defendant is sorry for what he did? Think about that for a moment. Any evidence at all that he's sorry?

. . . .

You saw three women get on the stand and cry. You saw [the victim's mother], and briefly, she, she lost her composure, and she cried. Did the Defendant shed any tears as she cried? Anybody look? Did you see any show of emotion of him as she cried for the loss of her son.

[Defendant's] mother, his own mother got on the stand and cried. Any tears over there? Did you see any? [Defendant's] sister, who's done so well. She cried for her brother. Did he? Did he cry for what he'd done to her? For what he'd done to [the victim]?

Defendant contends that he was placed in a position of having no way to rebut his absence of emotion except by taking the stand and testifying and, thus, that the judge should have intervened *ex mero motu* in order to stop the improper argument.

As we have stated numerous times, counsel will be allowed wide latitude in the argument of hotly contested cases, and the scope of

**STATE v. BATES**

[343 N.C. 564 (1996)]

that argument will largely be left to the discretion of the trial court. *State v. Huffstetler*, 312 N.C. 92, 112, 322 S.E.2d 110, 123 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). Although the appellate court may review an alleged error or impropriety in the State's argument notwithstanding the defendant's failure to flag the error for the trial court, " 'the impropriety . . . must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.' " *State v. Artis*, 325 N.C. 278, 323, 384 S.E.2d 470, 496 (1989) (quoting *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990)).

In the instant case, the prosecutor never commented directly or indirectly on defendant's failure to testify, nor did she suggest or infer that defendant should have taken the witness stand. Rather, the prosecutor commented on the demeanor of the defendant, which was before the jury at all times. *See, e.g., State v. Myers*, 299 N.C. 671, 679-80, 263 S.E.2d 768, 774 (1980). Such statements are not comparable to those which this Court has previously held to be improper comments on a defendant's failure to testify. *See, e.g., State v. Monk*, 286 N.C. 509, 212 S.E.2d 125 (1975); *State v. McCall*, 286 N.C. 472, 212 S.E.2d 132 (1975). Clearly, the trial court did not abuse its discretion by failing to intervene *ex mero motu* to stop the prosecutor's argument.

**[8]** In his seventh argument, defendant contends that the trial court erred by unduly restricting his *voir dire* of prospective jurors by sustaining an objection to one question regarding whether the prospective jurors would hold defendant's election not to testify against him. Relying upon this Court's decisions in *State v. Hightower*, 331 N.C. 636, 417 S.E.2d 237 (1992), and *State v. Cunningham*, 333 N.C. 744, 429 S.E.2d 718 (1993), defendant contends that he is entitled to a new trial because the trial court erred by sustaining the State's objection to the question propounded by the defense attorney.

In both *Hightower* and *Cunningham*, each defendant contended that the trial court erred in denying a challenge for cause to a juror. This Court agreed with the defendants' contentions that the prospective jurors were unable to render verdicts in accordance with North Carolina law. These prospective jurors gave ambiguous responses to questions concerning their understanding of the State's burden of

proof and the defendants' presumption of innocence as well as concerning their ability to follow the law and not to hold the defendants' election not to testify against them. In both cases, each defendant exhausted his peremptory challenges, the trial court denied his renewed challenge for cause, and the defendant informed the trial court that, if his challenge for cause was allowed, he would have an additional peremptory challenge to exercise against a particular prospective juror who did in fact serve on the jury which convicted each defendant. Under these circumstances, we granted the defendants new trials.

*Hightower* and *Cunningham* make it clear that a criminal defendant is entitled to be tried by an impartial and unbiased jury. In order to insure a fair trial before an impartial and unbiased jury, it is entirely proper in a criminal case for the defendant to make appropriate inquiry concerning a prospective juror's ability to follow the law. It is well established that a criminal defendant cannot be compelled to testify. N.C. Const. art. 1, § 23; N.C.G.S. § 8-54 (1986); *see* *State v. Randolph,* 312 N.C. 198, 205, 321 S.E.2d 864, 869 (1984). It is also settled that failure of the defendant to testify creates no presumption against him. *Id.* at 206, 321 S.E.2d at 869. Therefore, the defendant may question prospective jurors as to their views concerning the defendant's election not to testify and whether the jurors could be impartial in light of the defendant's election. However, while counsel may inquire into the potential jurors' fitness to serve, this is not an unbridled inquiry. The manner and extent of the inquiry is left in the sound discretion of the trial court, and the trial court's ruling will not be disturbed absent a showing of abuse of discretion. *State v. Weeks,* 322 N.C. 152, 162, 367 S.E.2d 895, 901 (1988).

During *voir dire* in the instant case, the exchange occurred as follows:

[DEFENSE COUNSEL]: Now, the Judge previously stated that as [defendant] sits here, he's presumed innocent. Does anybody disagree with the proposition of law that [defendant is] presumed innocent at this time?

(Some shake heads negatively; others do not respond)

[DEFENSE COUNSEL]: Do you also agree that it's the State's burden to prove guilt beyond a reasonable doubt? Does anybody have any problems with [that], whatsoever?

(Some shake heads negatively; others do not respond)

[DEFENSE COUNSEL]: Also, it's not our job to prove anything. It's the State's burden. The burden of proof is upon the State. If [defendant] elects not to testify, and we're not saying he will not, but if he did not testify, would any of you all hold that against him in any way?

[PROSECUTOR]: Well, **OBJECTION.**

THE COURT: **SUSTAINED.**

[DEFENSE COUNSEL]: Do you all disagree with the proposition that [defendant] has the right not to testify?

(Some shake heads negatively; others do not respond)

[DEFENSE COUNSEL]: Do you all disagree with that in any way?

(Some shake heads negatively; others do not respond)

Following this exchange, defense counsel did not pursue this line of questions, but proceeded to other issues.

The instant case is not controlled by *Hightower* and *Cunningham*, two cases involving the trial court's denial of the defendants' challenges for cause. Here, defendant made no challenge for cause based on the question involved. Instead, defendant sought to inquire as to whether the prospective jurors would hold his election not to testify against him. This same question arose in *State v. Conner*, 335 N.C. 618, 440 S.E.2d 826. There, we said:

As to defendant's argument concerning questions relating to defendant's right not to testify, defense counsel repeatedly attempted to ask a potential juror whether or not she would "hold it against" defendant if defendant elected not to testify. The person being examined was peremptorily challenged by defendant; therefore, defendant, not having exhausted his peremptory challenges, the error, if any, could not have been prejudicial to defendant. This assignment of error is without merit and is overruled.

*Conner*, 335 N.C. at 633, 440 S.E.2d at 834.

Like the defendant in *Conner*, defendant here did not exhaust his peremptory challenges. Therefore, prejudice does not appear. We note that in *Conner*, this question was asked of one prospective juror,

and there is no indication as to whether this or a similar question was asked of other prospective jurors. In the instant case, however, the judge sustained the objection when the question was asked to an entire panel. However, after the judge sustained the objection to the question, defendant was allowed to ask other questions related to his election not to testify. Additionally, we note that the trial court correctly instructed the jury that defendant's decision not to testify could not be used against him. For the foregoing reasons, we conclude that the trial court did not unduly restrict defendant's *voir dire* and hence did not abuse its discretion. Accordingly, we reject defendant's seventh argument.

**[9]** In his eighth argument, defendant contends that the trial court violated his due process right to a full and fair hearing in mitigation by allowing the prosecutor to argue several lines of improper argument in the penalty phase. We disagree.

It is well settled that the arguments of counsel are left largely to the control and discretion of the trial judge and that counsel will be granted wide latitude in the argument of hotly contested cases. *Huffstetler*, 312 N.C. at 112, 322 S.E.2d at 123. Counsel is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn therefrom. *State v. Hamlet*, 312 N.C. 162, 172, 321 S.E.2d 837, 844. Conversely, counsel is prohibited from arguing facts which are not supported by the evidence. *State v. Lynch*, 300 N.C. 534, 551, 268 S.E.2d 161, 171 (1980). These principles apply not only to ordinary jury arguments, but also to arguments made at the close of the sentencing phase in capital cases. *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761.

In the instant case, during the sentencing phase closing arguments, the prosecutor argued that one of defendant's motives in killing the victim was to prevent the victim from testifying against him. Defendant contends that this argument placed before the jury an additional aggravating circumstance. Next, the prosecutor, after showing the jury a picture of the victim dressed in a tuxedo, argued, "And, another thing about this picture, look at his hands. He had the most beautiful hands. And, we had to cut them off to find out who he was." Next, the prosecutor argued to the jury that defendant had been given the benefit of two lawyers to ask the jury not to return the death penalty, while the victim did not have the benefit of a trial or of anyone begging defendant to spare the victim's life. Finally, the prosecu-

tor asked the jury, "Can you imagine the devastation of that knock on the door that [the victim's mother] told you about with a law enforcement officer standing there? Can you imagine that?"

Defendant failed to object to any of the comments made by the prosecutor which are now assigned as error, and the trial court did not intervene *ex mero motu*. However, as we have said before: "[O]ur appellate courts may, in the absence of an objection by the defendant, review a prosecutor's argument to determine whether the argument was so grossly improper that the trial court committed reversible error in failing to intervene *ex mero motu* to correct the error." *State v. Williams*, 317 N.C. 474, 482, 346 S.E.2d 405, 410 (1986). After carefully reviewing the prosecutor's argument in its entirety, we conclude that it was not so grossly improper as to have necessitated intervention *ex mero motu* by the trial court. Accordingly, we reject defendant's eighth argument.

[10] In his ninth argument, defendant contends that the trial court erred in denying his motion to suppress his statement to police, which defendant alleges was made in violation of his state and federal constitutional rights.

Before defendant was Mirandized, he gave police officers three conflicting statements concerning the night in question. Thereafter, officers told defendant that they wanted to hear the complete truth. At that point, defendant signed a written waiver of his *Miranda* rights and dictated a thirteen-page statement which was introduced against him at trial. Defendant contends that, after having given his three statements to the police confessing to murder, any reasonable man would be aware that he had confessed to murder and would know that the logical and inevitable consequence of his confession is that he would be immediately arrested. Defendant contends that officers obtained the final Mirandized statement by building on the earlier tainted ones.

*Miranda* warnings are required prior to questioning only if one is in custody or has been deprived of one's freedom of action in a significant way. *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706 (1966); *State v. Perry*, 298 N.C. 502, 506, 259 S.E.2d 496, 499 (1979). The test for whether a person is in custody for *Miranda* purposes is whether a reasonable person in the suspect's position would feel free to leave or compelled to stay. *State v. Torres*, 330 N.C. 517, 412 S.E.2d 20 (1992).

STATE v. BATES

[343 N.C. 564 (1996)]

In the instant case, defendant filed a motion during his first trial to suppress his statement made to police on 31 August 1990. Defendant's motion was heard by Judge Rousseau, who conducted an extensive suppression hearing. Judge Rousseau made detailed findings of fact concerning the several interviews defendant had with various law enforcement and investigative officers. Based on these findings, Judge Rousseau concluded that, with regard to "any statement the Defendant made prior to [his Mirandized statement], he was not in custody; that he was free to leave, and [that the statement] is admissible into evidence if the State so desires." The court also concluded that defendant's statement of 31 August 1990 "was freely, voluntarily, and knowingly given without any promise of reward, and that . . . after being advised of his rights, and stating that he did not want an attorney, that that statement is admissible in the trial of this case." Accordingly, Judge Rousseau denied defendant's motion to suppress defendant's statement.

After this Court granted defendant a new trial, defendant again filed a motion to suppress the same statement. On 14 June 1994, Judge W. Douglas Albright denied the motion, relying on Judge Rousseau's denial of defendant's motion to suppress entered at defendant's first trial. However, on 15 June 1994, Judge Albright entered an order denying defendant's motion to suppress on the ground that defendant

made an insufficient showing to satisfy the Court that such additional pertinent facts ha[d] been discovered by the Defendant which he could not have discovered with reasonable diligence before the determination of the motion by Judge Rousseau, which would warrant the Court permitting the Defendant to renew the Motion to Suppress, which was the subject of an extensive *voir dire* . . . and full inquiry by Judge Rousseau, who made findings of fact and conclusions of law.

"A trial court's findings of fact are binding on appeal when supported by competent evidence." *State v. Rose*, 335 N.C. 301, 333, 439 S.E.2d 518, 536, *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 883 (1994). In the instant case, Judge Rousseau found as fact that the defendant agreed to talk with law enforcement officers and agreed to go to the Sheriff's Department; that defendant drove to the Sheriff's Department, accompanied by his friend, Eddie Atkins; that when defendant arrived, he spoke with three law enforcement officers; that

the officers thanked defendant for coming to the Sheriff's Department and told defendant that he was not under arrest and was free to leave at any time; that the officers spoke to defendant for approximately forty minutes, during which time defendant told three different stories about what happened on the night in question; that, thereafter, defendant went to the bathroom alone; that, after defendant returned from the bathroom, the officers asked defendant if he would tell the truth, and defendant said that he would; that defendant was then advised of his *Miranda* rights, and defendant signed a written waiver of those rights; and that defendant was given a drink and cigarettes throughout the interview. Because these findings of fact are supported by the evidence and the findings support the trial court's conclusion of law, we cannot disturb the trial court's ruling. Therefore, we conclude that defendant was not in custody at the time of his pre-arrest statements to law enforcement officers and that *Miranda* warnings were not required. *See State v. Phipps*, 331 N.C. 427, 418 S.E.2d 178 (1992) (defendant not in custody when he went to police station on his own, was permitted to return home, and later agreed to take a polygraph test); *State v. Martin*, 294 N.C. 702, 242 S.E.2d 762 (1978) (defendant not in custody when he voluntarily went to the police station and made a statement, and police officers returned him to his home afterwards); *see also State v. Bromfield*, 332 N.C. 24, 37, 418 S.E.2d 491, 498 (1992) (no seizure where defendant agreed to accompany officers to the police station, was not handcuffed, was told there were no charges against him and that he was free to go, went unescorted to the snack bar and rest rooms, and acknowledged that based upon prior experiences, he could not be coerced into talking with officers); *State v. Johnson*, 317 N.C. 343, 369, 346 S.E.2d 596, 609-10 (1986) (no seizure where defendant agreed to accompany officers to the police station, was not frisked, was given cigarettes and coffee, and was allowed to go unescorted to the bathroom and to make telephone calls). Accordingly, we hold that defendant was not seized for Fourth Amendment purposes and that the trial court did not err in denying defendant's motion to suppress.

[11] In his tenth argument, defendant contends that the trial court erred by unduly restricting his *voir dire* of prospective jurors, thereby preventing him from making effective use of his peremptory challenges and violating his constitutional rights. Defendant argues that he should have been allowed to inquire of potential jurors whether they would vote their conscience even if the vote was eleven to one against them.

During *voir dire*, defendant attempted to ask jurors whether, if they thought all the evidence and all the factors supported voting for life imprisonment, they would vote for life imprisonment even if eleven other jurors felt that death was appropriate. The trial court sustained the State's objection. Defendant contends that his question mirrors the law of North Carolina that "[n]o juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict." N.C.G.S. § 15A-1235(b)(4) (1988).

In *State v. Jones*, 339 N.C. 114, 451 S.E.2d 826 (1994), we addressed a similar question. The trial court did not allow the defendant to ask jurors how they would react if, during deliberations, they were the only juror on a particular side of an issue. In concluding that the trial court's ruling was proper, we said that the question was "intended to elicit from the jurors how they would vote under a particular set of given facts. Such questions tend to cause jurors to pledge themselves to a decision in advance of the evidence to be presented and are therefore improper." *Id.* at 135, 451 S.E.2d at 835-36.

In the instant case, the question was improper because it attempted to place the jurors in a hypothetical situation of being deadlocked eleven to one. The trial court did not abuse its discretion by sustaining the State's objection to defendant's hypothetical question which tended to stake out jurors to a certain position. Accordingly, we reject defendant's tenth argument.

**[12]** In his eleventh argument, defendant contends that the trial court violated his due process rights to a fair trial and a reliable sentencing proceeding by allowing the State to introduce a number of gruesome photographs of the victim's body in a state of advanced decomposition. The photographs included those taken at the scene after the victim's body was retrieved from the river as well as photographs taken at the victim's autopsy. Defendant contends these photographs were inflammatory due to the advanced state of decomposition brought on by the ravages of decomposition in water with attendant damages by fish and other river scavengers. We disagree that the showing of the photographs violated defendant's right to a fair trial and reliable capital sentencing proceeding.

The photographs in question depicted the location of the body when it was discovered and the condition of the body when found, including the ropes still tied to the body. The State argues that the photographs were admissible as illustrative of the pathologist's testi-

mony with regard to the condition of the victim's body when found and the wounds it had sustained. We agree with the State.

This Court has stated that "[p]hotographs of homicide victims are admissible at trial even if they are 'gory, gruesome, horrible, or revolting, so long as they are used by a witness to illustrate his testimony and so long as an excessive number of photographs are not used solely to arouse the passions of the jury.'" *State v. Thompson*, 328 N.C. 477, 491, 402 S.E.2d 386, 394 (1991) (quoting *State v. Murphy*, 321 N.C. 738, 741, 365 S.E.2d 615, 617 (1988)).

*State v. Rose*, 335 N.C. 301, 319, 439 S.E.2d 518, 528.

In *State v. Lee*, 335 N.C. 244, 278-79, 439 S.E.2d 547, 565, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 162 (1994), we said, "Where the victim's identity and the cause of his or her death are uncontroverted, a trial court may nevertheless allow in evidence photographs showing the condition of the body and its location when found."

The photographs at issue depicted the victim's hog-tied body in an advanced state of decomposition. The photographs also purported to depict the location where the body was found. Although the victim's identity and the cause of his death were not in dispute, these photographs showed the circumstances of his death which were relevant to the issues to be determined in defendant's trial and capital sentencing proceeding. We find no error in admitting these photographs into evidence. Accordingly, we reject defendant's eleventh argument.

[13] In his twelfth argument, defendant contends that his constitutional rights were violated by the prosecutor's gender-biased exercise of peremptory challenges. Defendant argues, essentially, that the prosecution's exercise of eight of twelve peremptory challenges against women makes a *prima facie* case of gender discrimination. In this instance, we conclude that defendant has not made a *prima facie* case demonstrating that the State exercised its peremptory challenges on the basis of gender.

The United States Supreme Court has held that the Equal Protection Clause of the Fourteenth Amendment governs the exercise of peremptory challenges by a prosecutor in a criminal trial. *Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 82 (1986). The Supreme Court has stated that "[i]ntentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where . . . the discrimination serves to ratify and perpet-

uate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, ——, 128 L. Ed. 2d 89, 98 (1994). Thus, the Supreme Court said, "the Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assumption that an individual will be biased in the particular case for no reason other than the fact that the person happens to be a woman or happens to be a man." *Id.* at ——, 128 L. Ed. 2d at 107.

As with race-based *Batson* claims, a party alleging gender discrimination must make a *prima facie* showing of intentional or purposeful discrimination before the party exercising the peremptory challenge is required to explain the basis for the strike. *Id.* at ——, 128 L. Ed. 2d at 106-07. Once the defendant makes his *prima facie* showing, the burden shifts to the State to come forward with a neutral explanation for having peremptorily challenged those jurors. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88. This Court has applied these principles and has permitted a third step in the analysis, specifically, that of allowing a defendant to introduce evidence that the State's explanations are merely a pretext. *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991).

A party objecting on constitutional grounds to the challenge to a venireperson on the basis of gender establishes a *prima facie* case of purposeful discrimination first by showing that the peremptory challenge was exercised against a member of a constitutionally cognizable group. *See Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87. Second, the party must demonstrate that this fact "and any other relevant circumstances raise an inference" that the offending party challenged the venireperson because of his or her group membership. *Id.* The burden then shifts to the offending party to articulate a nondiscriminatory reason related to the particular case to be tried for challenging the juror. *Id.* at 98, 90 L. Ed. 2d at 88. The trial court's findings regarding purposeful discrimination in the jury selection process are findings which we will not set aside unless clearly erroneous. *Id.* at 98 n.21, 90 L. Ed. 2d at 89 n.21; *United States v. Power*, 881 F.2d 733, 739 (9th Cir. 1989).

In the instant case, this issue arose at the point in the jury selection process when ten women and no men had been seated on the jury, and defendant had peremptorily challenged four women. The State had peremptorily challenged eight women. Defendant does not argue, and we cannot find, any factor other than the proportion of

women challenged by the prosecutor to support his contention that the peremptory challenges were exercised solely on the basis of gender. The proportion of women challenged by the prosecutor in this case, standing alone, is insufficient to establish a *prima facie* case of gender discrimination. Under these circumstances, we conclude that defendant failed to carry his burden of establishing a *prima facie* case of gender discrimination in the prosecutor's exercise of her peremptory challenges. Accordingly, we reject defendant's twelfth argument.

**[14]** In his thirteenth argument, defendant contends that his due process rights were violated when the court allowed the district attorney to secure a pledge from jurors that they could return the death penalty in this case "without hesitation."

During the jury selection process, the prosecutor asked virtually every prospective juror whether she or he could, if she or he determined the death penalty to be appropriate, return a recommendation of a sentence of death "without hesitation." Defendant did not object to these questions by the prosecutor. Nevertheless, defendant now contends that the prosecutor staked out virtually every juror as to the ultimate issue in this case by asking for no less than a pledge from each juror that he or she could and would deliver the death penalty without hesitation. Any doubt about the prosecutor's intention, defendant contends, was dispelled in her closing argument in the penalty phase:

> And, I think without exception, during our jury selection process, I asked each and every one of you, if you go back there and you deliberate, and determine together with the rest of the jury whether that [sic] the death penalty is appropriate, can you come back into this courtroom and announce that without hesitation. Each of you assured me you could.

Defendant argues that to allow the State to secure and play off such a pledge is a fundamental denial of his right to secure a fair trial and impartial jury.

Because defendant did not object to the questions or the prosecutor's argument to which he now assigns error, we shall consider defendant's argument under the plain error rule. *See State v. Reeves,* 337 N.C. 700, 729-30, 448 S.E.2d 802, 815 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 860 (1995). We believe that a reasonable interpre-

STATE v. BATES

[343 N.C. 564 (1996)]

tation of the prosecutor's question is whether the juror could recommend the death penalty if she or he found that the aggravating circumstances outweighed the mitigating circumstances and that the prosecutor's argument was intended only to remind jurors of their duty during the capital sentencing proceeding to recommend a sentence of death if the evidence supported this recommendation. Clearly, the jurors' understanding of their responsibilities was not diminished by the prosecutor's questions and argument, and no fundamental right to a fair trial was denied. We conclude that neither the prosecutor's questions nor jury argument were so grossly improper or egregious as to require the trial court to intervene in the absence of an objection by defense counsel. Accordingly, we reject defendant's thirteenth argument.

[15] In his fourteenth argument, defendant contends that the trial court erred in allowing the prosecutor to ask defendant's witnesses questions designed to imply that defendant was a person of bad and violent character when no issue existed as to his character for violence prior to the time the question was asked.

During cross-examination of defendant's mother in the penalty phase of defendant's trial, the prosecutor asked defendant's mother if she was aware that defendant had broken his wife's arm. Defendant's objection was overruled.

Cross-examination as to defendant's specific violent acts of conduct is not admissible unless it is introduced to rebut a pertinent trait of character when offered first by defendant. *State v. Lynch*, 334 N.C. 402, 432 S.E.2d 349 (1993). In the instant case, defendant contends that he never offered any evidence that he loved his wife or that he was a nonviolent person toward his wife or anyone else. Therefore, defendant argues that the prosecutor was not entitled to cross-examine defendant's mother on this issue since there was no evidence to rebut.

In *State v. Warren*, we said:

Generally, much latitude is given counsel on cross-examination to test matters related by a witness on direct examination. *State v. Burgin*, 313 N.C. 404, 329 S.E.2d 653 (1985). The scope of cross-examination is subject to two limitations: (1) the discretion of the trial court; and (2) the questions offered must be asked in good faith. *State v. Dawson*, 302 N.C. 581, 585, 276 S.E.2d 348, 351 (1981).

*Warren,* 327 N.C. 364, 373, 395 S.E.2d 116, 121-22 (1990). In the instant case, defendant does not argue that the question asked of his mother was asked in bad faith. We conclude that the trial court did not abuse its discretion in permitting defendant's mother to answer the question, over defendant's objection, on cross-examination. Accordingly, we reject defendant's fourteenth argument.

## PRESERVATION ISSUES

Defendant raises ten additional arguments which he concedes have been decided against him by this Court: (1) the trial court violated defendant's due process rights by denying his motion to inform jurors of parole eligibility; (2) the trial court's instructions defining the burden of proof applicable to mitigating circumstances violated defendant's rights because they used the inherently ambiguous and vague terms "satisfaction" and "satisfy" to define the burden of proof, thus permitting jurors to establish for themselves the legal standard to be applied to the evidence; (3) the trial court's instructions that permitted jurors to reject submitted mitigation on the basis that it had no mitigating value violated defendant's constitutional rights; (4) the trial court violated defendant's constitutional rights by denying him the right to further question potential jurors after they indicated they were opposed to the death penalty; (5) the trial court committed reversible constitutional error by submitting to the jury the "especially heinous, atrocious, or cruel" aggravating circumstance based upon instructions that failed adequately to limit the application of this inherently vague and overbroad circumstance; (6) the trial court's use of the term "may" in instructing on sentencing issues three and four violated defendant's rights in that it made consideration of proven mitigation discretionary with jurors; (7) the trial court's instruction to the jury that it must find both instances of conduct, that defendant shot an animal *and* fought in school, in order to find the statutory mitigating circumstance of no significant criminal activity violated defendant's rights; (8) the trial court erred in instructing the jury that the first four submitted mitigating circumstances were statutory and the rest nonstatutory, implying that the statutory circumstances were more important or carried more weight; (9) the trial court violated defendant's due process rights by denying his motion to inform jurors of parole eligibility; and (10) defendant's due process rights and right to a reliable capital sentencing proceeding were violated because the State's death penalty scheme is unconstitutional.

Defendant raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of pre-

serving them for any possible further judicial review of this case. We have carefully considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Accordingly, we reject these assignments of error.

## PROPORTIONALITY REVIEW

[16]   Having concluded that defendant's trial and separate capital sentencing proceeding were free of prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. It is our duty in this regard to ascertain: (1) whether the record supports the jury's findings of the aggravating circumstances on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. N.C.G.S. § 15A-2000(d)(2).

In the instant case, the jury found defendant guilty of first-degree murder under the theory of malice, premeditation, and deliberation, as well as under the felony murder rule. It also convicted defendant of first-degree kidnapping. The trial court submitted two aggravating circumstances to the jury: that the murder was committed while defendant was engaged in the commission of a kidnapping, N.C.G.S. § 15A-2000(e)(5), and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). The jury found both aggravating circumstances to exist.[1] After thoroughly examining the record, transcripts, and briefs in the present case, we conclude that the record fully supports the two aggravating circumstances found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must turn then to our final statutory duty of proportionality review.

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, —— U.S. ——, 129

---

1. Of the four statutory mitigating circumstances, two were found to exist by one or more members of the jury. Of the twelve nonstatutory mitigating circumstances, five were found to exist by one or more members of the jury. The catchall mitigating circumstance was not found to exist by any member of the jury.

L. Ed. 2d 895 (1994). We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

In *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170, the trial court submitted and the jury found two aggravating circumstances: that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9), and that the murder was part of a course of conduct in which the defendant was engaged which included the commission by the defendant of other crimes of violence against another person or other persons, N.C.G.S. § 15A-2000(e)(11). The defendant had pointed a gun at the victim and taunted him for some two to three minutes before finally shooting him. Of importance to the Court in finding the death sentence disproportionate was that defendant immediately secured medical attention for the victim, directing the driver of the car to the hospital. 309 N.C. at 694, 309 S.E.2d at 182-83. By contrast, in the present case, the defendant tortured the victim for several hours before finally shooting him in the neck. Furthermore, defendant here did not seek medical attention for the victim. Instead, defendant threw the victim's hog-tied body into the Yadkin River after removing the two cinder blocks he had tied around the victim's neck since he could not lift the body with the cinder blocks tied to it.

In only one case where we have found the death penalty disproportionate, *State v. Young*, 312 N.C. 669, 325 S.E.2d 181, were multiple aggravating circumstances found to exist. *State v. Gibbs*, 335 N.C. 1, 73, 436 S.E.2d 321, 362-63 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 881 (1994). In *Young*, this Court focused on the jury's failure to find either the especially heinous, atrocious, or cruel aggravating circumstance, N.C.G.S. § 15A-2000(e)(9), or the course of conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11). *Id.* In the instant case, however, the especially heinous, atrocious, or cruel circumstance was one of the two aggravating circumstances found by the jury.

It is also proper to compare this case to those where the death sentence was found proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although we have repeatedly stated that we review all of the cases in the pool when engaging in our statutory duty, it is worth noting again that "we will not undertake to discuss or cite all of those cases each time we carry out our duty." *Id.* It suffices to say here that we conclude the present case is similar to certain cases in which we have found the death sentence proportionate.

The aggravating circumstances found in this case have been present in other cases where this Court has found the sentence of death proportionate. *See State v. Robinson*, 342 N.C. 74, 463 S.E.2d 218 (1995) (the trial court submitted and the jury found two aggravating circumstances: that the murder was committed while defendant was engaged in the commission of or attempting to commit robbery with a firearm and first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5), and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9)), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 64 U.S.L.W. 3763 (1996); *State v. Frye*, 341 N.C. 470, 461 S.E.2d 664 (1995) (the trial court submitted and the jury found two aggravating circumstances: that the murder was committed while defendant was engaged in a robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5), and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9)), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 526 (1996); *State v. Simpson*, 341 N.C. 316, 462 S.E.2d 191 (1995) (the trial court submitted and the jury found two aggravating circumstances: that the murder was committed while defendant was engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5), and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9)), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 194 (1996). In fact, in *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 1083 (1996), this Court noted that it has affirmed death sentences based on four of the eleven aggravating circumstances when only one aggravating circumstance was submitted to and found by the jury. The (e)(5) and (e)(9) aggravating circumstances found by the jury in the instant case are among these four aggravating circumstances. *Id.* at 110 n.8, 446 S.E.2d at 566 n.8.

After comparing this case to other roughly similar cases as to the crime and the defendant, we conclude that this case has the characteristics of first-degree murders for which we have previously upheld the death penalty as proportionate. Accordingly, we cannot conclude

that defendant's death sentence is excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.