**Joseph Earl BATES, Petitioner–Appellant,**

v.

**R.C. LEE, Warden, Central Prison, Raleigh, North Carolina, Respondent–Appellee.**

No. 02–4.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 26, 2002.

Decided Oct. 23, 2002.

**ARGUED:** Robert Hood Hale, Jr., Raleigh, North Carolina; Rosemary Godwin, Raleigh, North Carolina, for Appellant. Barry Steven McNeill, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Roy Cooper, Attorney General of North Carolina, North Carolina Department of Justice, Raleigh, North Carolina, for Appellee.

Before WILKINSON, Chief Judge, WIDENER, Circuit Judge, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge WIDENER and Senior Judge HAMILTON joined.

## OPINION

WILKINSON, Chief Judge.

Appellant Joseph Earl Bates was sentenced to death for the murder of Charles Edwin Jenkins. Bates does not contest the fact that he committed the murder. After exhausting state challenges to the sentence imposed by the state courts, Bates petitioned the United States District Court for the Middle District of North Carolina for a writ of habeas corpus under 28 U.S.C. § 2254. The district court found no merit in his claims and dismissed the petition. We now affirm.

### I.

On August 25, 1990, two fishermen discovered Charles Jenkins' body floating in the Yadkin River, in Yadkin County, North Carolina. The victim's ankles and wrists were bound by rope, his legs and arms were hog-tied, and a rope was tied around his neck. While investigating the murder, two police officers went to Bates' house to speak with him. At that time, the officers obtained a piece of paper and some molding from Bates' home having what appeared to be bloodstains on it. The following day, Bates gave a thirteen-page confession, in which he admitted to beating, hog-tying, kidnapping, and then shooting the victim in the neck. Bates was indicted for kidnapping and murder.

The facts surrounding the crime are undisputed. Some time in late July or early August 1990, someone broke into and fired gunshots into Bates' home, causing Bates to set up a temporary campsite on his employer Hal Eddleman's property. Around this same time Bates told his friend, Gary Shaver, that he could kill someone.

On August 10, Bates called Eddleman and told Eddleman to meet him at the bridge later that evening because something was "going down." Eddleman went to the bridge as instructed, but Bates never came to meet him. The next evening Bates and Shaver went to a night club. At approximately 1:45 a.m., Bates instructed a waitress to ask Billy Grimes, another friend, to telephone Eddleman. Bates told

her that Grimes and Eddleman would know what was going on.

At approximately 2:00 a.m., Jenkins asked Bates and Shaver for a ride home. During the ride, Bates asked Jenkins if he knew Bates' ex-wife and her new boyfriend, and Jenkins replied that he did. Bates stopped twice during the ride. During the second stop, Bates struck Jenkins three times on the back of the head with a shovel, appearing to knock him unconscious. When Jenkins began to moan, Bates struck him again, hog-tied him, and then placed him in the vehicle.

On the way back to his campsite, Bates stopped at Eddleman's house and told Eddleman that he "got one of the MF's." He then told Grimes, "I've got one of the guys that's been messing with me. Do you want to watch or help?" Grimes declined to help, as did Shaver and Eddleman. Bates drove Jenkins back to his campsite around 4:00 a.m.

At the campsite, Bates loosened the ropes on Jenkins and began asking Jenkins who had shot into his home. Jenkins mentioned two people who were involved, but did not say anything else. Unsatisfied with Jenkins' response, Bates then tied Jenkins to a tree and went to his tent to retrieve a gun that he had borrowed from Eddleman. Bates put the gun up to Jenkins throat, but Jenkins repeated that he did not know for sure who had shot into Bates' home. Bates then untied Jenkins, took him to the back of the truck, and shot him in the neck. Jenkins was lying face-up near the back of the truck when Bates shot him. In his confession, Bates said he "shot him ... because he acted like he knew who had shot into my house, he spit on me and told me to go to hell, and this made me mad and I shot him."

After rummaging through Jenkins' pockets, Bates retied Jenkins' hands and feet and loaded him into the jeep. Bates drove back to Eddleman's house, returned Eddleman's gun, and asked, "[w]hat do you think I should do with the body." Bates then left and threw the body into the Yadkin River.

Later that day Bates discussed the murder with both Eddleman and Grimes. Bates told Eddleman, "[w]ell, it don't bother me all that bad." Bates told Grimes that he killed the victim because he would get no more time for murder than for kidnapping.

Bates was indicted for kidnapping and murder. The State sought the death penalty. A jury found Bates guilty of one count of first degree murder and one count of first degree kidnapping. He was sentenced to death for the first degree murder conviction. On appeal, the North Carolina Supreme Court awarded Bates a new trial based on an improper denial of Bates' motion for an ex parte hearing regarding his request for funds to employ a forensic psychologist. *State v. Bates,* 333 N.C. 523, 428 S.E.2d 693 (1993). Bates was retried, and a second jury found Bates guilty of one count of first degree kidnapping and one count of first degree murder on the basis of both the felony murder rule and premeditation and deliberation.

During the closing argument of the penalty phase of the second trial, the prosecutor pointed out that Jenkins' mother, Bates' mother, and Bates' sister each cried while on the stand. The prosecutor then asked whether the jurors saw Bates cry during the trial, or whether Bates had presented any evidence of remorse. The prosecutor also commented that Bates had been given the benefit of a lengthy trial and two good lawyers who would stand up and ask the jurors not to return the death penalty, because it was a lawyer's job to do so.

The jury recommended the death sentence on the basis of the kidnapping and the especially heinous, atrocious, or cruel nature of the crime. On November 9, 1994, Judge Julius Rousseau sentenced Bates to death for the first degree murder conviction and to an additional forty years in prison for the kidnapping conviction. The Supreme Court of North Carolina affirmed the conviction and sentence, *State v. Bates,* 343 N.C. 564, 473 S.E.2d 269 (1996), and the United States Supreme Court denied certiorari, *Bates v. North Carolina,* 519 U.S. 1131, 117 S.Ct. 992, 136 L.Ed.2d 873 (1997).

Bates then filed a motion for appropriate relief. The North Carolina Superior Court entered an order denying Bates' claims, and the Supreme Court of North Carolina affirmed. *State v. Bates,* 350 N.C. 837, 539 S.E.2d 297 (1999).

Next, Bates filed a petition for habeas corpus in the United States District Court for the Middle District of North Carolina. On February 14, 2002, the district court adopted the magistrate's recommendation to dismiss Bates' petition. *Bates v. Lee,* No. 1:99CV00742 (M.D.N.C. Feb. 14, 2002). Finding no substantial issue presented, the district court also declined to issue a certificate of appealability. *Id.* Bates now appeals.

## II.

Federal courts entertaining collateral attacks on state convictions have only limited powers of judicial review. *See Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under 28 U.S.C. § 2254(d)(1) (2002), federal courts may not grant a writ of habeas corpus when a state court has already resolved the merits of a claim unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States." 28 U.S.C. § 2254(d)(1) (2002).

A state court decision is contrary to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from [its] precedent." *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495.

A state court decision involves an unreasonable application of Supreme Court precedent if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id.* at 407–08, 120 S.Ct. 1495, or "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone,* 530 U.S. 156, 166, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000) (opinion of Kennedy, J.). The Supreme Court has stressed the importance of the word "unreasonable" in the standard of review. "Under § 2254(d)(1)'s 'unreasonable application' clause ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams,* 529 U.S. at 411, 120 S.Ct. 1495.

In this case, Bates argues that the North Carolina Supreme Court's decision was an unreasonable application of clearly established federal law because (1) the trial court erroneously failed to instruct the jury on second degree murder; (2) the prosecutor's closing comments during the penalty phase violated the defendant's Fifth Amendment right to remain silent

and his due process rights; and (3) the jury instructions on the "heinous, atrocious or cruel" aggravating circumstance were vague and overbroad in violation of the Fifth, Eighth and Fourteenth Amendments. We address each argument in turn.

III.

First, Bates contends that the North Carolina courts unreasonably applied federal law by failing to instruct the jury on the lesser included offense of second degree murder. Bates argues that Jenkins provoked him to commit the murder. This, in combination with other circumstances in his life at the time, constituted enough evidence to negate deliberation, and the trial court should have therefore instructed the jury on second degree murder.

In capital cases, due process requires the court to give an instruction on any lesser included offense when the evidence warrants such an instruction. *Beck v. Alabama*, 447 U.S. 625, 637–38, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). But "[a] defendant is not entitled to have the jury instructed as to lesser degrees of the crime simply because the crime charged is murder." *Briley v. Bass*, 742 F.2d 155, 164 (4th Cir.1984). Instead, "due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). "The decision of whether there is enough evidence to justify a lesser included offense charge rests within the sound discretion of the trial judge." *United States v. Chapman*, 615 F.2d 1294 (10th Cir.1980). Further, "[w]here . . . the highest court of a state has reviewed a defendant's request for a lesser included offense instruction and concluded that it is not warranted by the evidence elicited at

trial, that conclusion is axiomatically correct, as a matter of state law. Accordingly, the circumstances that would induce a federal court to overturn the state court determination would need to be extraordinary, indeed." *Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir.1990). Because "federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), our only question here is whether the North Carolina courts' finding that there was insufficient evidence to support a second degree murder instruction was so wrong as to amount to a fundamental miscarriage of justice. *E.g., Nichols v. Gagnon*, 710 F.2d 1267, 1269 (7th Cir.1983).

North Carolina law recognizes three degrees of homicide, two of which are relevant here. Murder in the first degree is the unlawful killing of another human being with malice and with premeditation and deliberation. N.C. Gen.Stat. § 14–17 (2002); *State v. Watson*, 338 N.C. 168, 449 S.E.2d 694, 699 (1994). Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation. *State v. Duboise*, 279 N.C. 73, 181 S.E.2d 393, 398 (1971).

Premeditation means that "defendant formed the specific intent to kill the victim for some period of time, however short, before the actual killing. Deliberation means that the intent to kill was formed while defendant was in a cool state of blood and not under the influence of a violent passion suddenly aroused by sufficient provocation." *State v. Misenheimer*, 304 N.C. 108, 282 S.E.2d 791, 795 (1981) (citations omitted). North Carolina courts consider several factors in determining the existence of premeditation and deliberation, including (1) provocation by the de-

ceased; (2) the defendant's conduct and statements before and after the killing; (3) "threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of [the] deceased"; (4) "ill-will or previous difficulty between the parties"; (5) "the dealing of lethal blows after the deceased has been felled and rendered helpless"; and (6) "evidence that the killing was done in a brutal manner." *State v. Fisher,* 318 N.C. 512, 350 S.E.2d 334, 338 (1986). Provocation by the deceased can negate deliberation, so long as it is strong "enough to arouse a sudden and sufficient passion in the perpetrator...." *State v. Salmon,* 140 N.C.App. 567, 537 S.E.2d 829, 834 (2000). However, "[i]f the State's evidence establishes each and every element of first-degree murder and there is no evidence to negate these elements, it is proper for the trial court to exclude second-degree murder from the jury's consideration." *State v. Flowers,* 347 N.C. 1, 489 S.E.2d 391, 407 (1997).

 Bates argues that two circumstances negate the element of premeditation and deliberation. First, he contends that the circumstances of his life at the time of the murder demonstrate that he was distressed and thus unable to form the mental state to commit first degree murder. Bates points out that he had been recently estranged from his wife, that someone had broken into and shot at his home, and that he believed Jenkins was setting him up. Second, Bates argues that his confession, where he stated that Jenkins made him mad by spitting on and cursing at him, in combination with the circumstances of his life at the time, negates deliberation. Bates, however, misinterprets the quantum of evidence necessary to negate this element.

 Under North Carolina law, a showing of mere anger is not sufficient to prove that a defendant lost his ability to reason and thus to negate deliberation. "Anger and emotion frequently coincide with murder, but a court should instruct on murder in the second degree only when the evidence would permit a reasonable finding that the defendant's anger and emotion were strong enough to disturb the defendant's ability to reason." *State v. Perry,* 338 N.C. 457, 450 S.E.2d 471, 474 (1994). Bates introduced evidence that he was angry and distressed before the killing occurred. He did not, however, introduce any evidence tending to show that his ability to reason had been disturbed. In fact, Bates' confession tends to contradict that inference. Bates clearly states in his confession that when he brought Jenkins back to his campsite he "was not drunk or doing drugs at the tim[e]. I knew what was going on." Nothing in his confession suggests that Bates lost the ability to formulate rational thought.

Furthermore, the uncontroverted evidence at trial demonstrates premeditation and deliberation. The factors that North Carolina courts use in evaluating the existence of premeditation and deliberation strongly suggest their existence here. Bates relies on the first factor, provocation by the deceased, to negate deliberation. He ignores, however, the evidence demonstrating that before Jenkins spat on and cursed at him, Bates had already kidnapped, hogtied, and then beat and questioned Jenkins for a period of several hours. Furthermore, Bates' conduct prior to and after the killing overwhelmingly supports the existence of premeditation and deliberation. Prior to the killing Bates told Shaver that he could kill someone, and then repeatedly told his friends that something would be "going down." After the murder, Bates told Grimes that he killed Jenkins because Bates couldn't let Jenkins live after Bates tortured him, and that he would get no more time for

murder than for kidnapping. These statements contradict any suggestion that Bates shot Jenkins because Jenkins made him so angry that he lost the ability to reason. In fact, they suggest just the opposite—that the murder was a calculated act, however twisted that calculus might be.

■ We acknowledge that under North Carolina law provocation by the deceased can suffice to negate deliberation. *See State v. Watson*, 338 N.C. 168, 449 S.E.2d 694, 700 (1994). The North Carolina courts found that it did not, however, suffice in this case. The sole evidence Bates offers to support a second degree murder instruction is his statement that the victim spat on and cursed at him which made him mad. That evidence does not tend to establish that his ability to reason had been disturbed. Furthermore, Bates' confession, where Bates states that the victim was lying on his back face-up when he shot him, suggests that there was some period of time between the alleged provocation and the actual murder.

■ Nothing in the North Carolina jury instructions approached a due process violation. And while the parties argue extensively over state law, "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). *Beck* requires a trial court to give a lesser included offense instruction when the evidence so warrants. The North Carolina trial court, in the face of overwhelming evidence of premeditation and deliberation, reasonably determined that under North Carolina law the evidence did not warrant such an instruction. Thus, we must reject Bates' argument and hold that the North Carolina Supreme Court did not unreasonably apply the rele-

vant Supreme Court precedent to the facts of this case.

## IV.

Next, Bates argues that the prosecutor's closing arguments at sentencing violated his Fifth Amendment right to remain silent and his due process rights. We also review these claims for whether the North Carolina Supreme Court's decision was contrary to, or an unreasonable application of, clearly established Federal law. *See Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

## A.

Bates made no objection at any time to the prosecution's sentencing argument. He contends, however, that the trial court erred by failing to intervene *ex mero motu* to prevent the prosecutor from commenting on his right to remain silent. Bates contends that by pointing out to the jury that other witnesses in the case had gotten on the stand and cried, and then asking the jurors whether they had observed Bates crying, the prosecutor implicitly argued that Bates should have testified.

■ The Constitution "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). A prosecutor improperly comments on the defendant's failure to testify when "the language used [is] manifestly intended to be, or ... [is] of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Anderson*, 481 F.2d 685, 701 (4th Cir.1973), *aff'd*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974).

During the sentencing portion of the trial, the prosecutor argued:

> Have you heard any evidence at all that the Defendant is sorry for what he did? Think about that for a minute. Any evidence at all that he's sorry?
>
> ...
>
> [H]e was bragging about ... bragging about throwing this body in the river. Bragging. Is he sorry?
>
> When he said to Hal, "It doesn't bother me. I[t] doesn't bother me," was he sorry. When he talked to Gary Shaver, "Chill out. Don't worry about it. I don't."
>
> ...
>
> You saw three women get on the stand and cry. You saw [the victim's mother], and briefly ... she lost her composure, and she cried. Did the Defendant shed any tears as she cried? Anybody look? Did you see any show of emotion of him as she cried for the loss of her son.
>
> [The defendant's] mother, his own mother got on the stand and cried. Any tears over there? Did you see any? [The defendant's] sister, who's done so well. She cried for her brother. Did he? Did he cry for what he'd done to her? For what he'd done to Charlie?

■ We do not think this closing argument, pungent though it was, violated the defendant's Fifth Amendment right to remain silent at sentencing. And in so holding, the North Carolina Supreme Court did not unreasonably apply clearly established federal law. This court has found that prosecutorial comments about the lack of remorse demonstrated by a defendant's demeanor during trial do not violate a defendant's Fifth Amendment right not to testify. *Howard v. Moore*, 131 F.3d 399, 421 (4th Cir.1997); *Gaskins v. McKellar*, 916 F.2d 941, 951 (4th Cir.1990); *see* *also Six v. Delo*, 94 F.3d 469, 476–77 (8th Cir.1996).

The prosecutor's comments in this case fall within the scope of *Howard* and *Gaskins*. The prosecutor never commented directly or indirectly on Bates' failure to testify. Rather, as the Supreme Court of North Carolina observed, "the prosecutor commented on the demeanor of the defendant, which was before the jury at all times. Such statements are not comparable to those which this Court has previously held to be improper comments on a defendant's failure to testify." *State v. Bates*, 343 N.C. 564, 473 S.E.2d 269, 281 (1996) (internal citation omitted). Moreover, reference to Bates' remarks immediately following the murder constituted nothing more than a repetition of the evidence already presented at trial.

Bates' reliance on *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir.1991), is misplaced. In *Lesko*, the prosecutor asked the jury to consider Lesko's arrogance on the witness stand and argued that Lesko did not even have the "common decency to say I'm sorry for what I did." *Id.* at 1544. The Third Circuit judged this an impermissible comment on Lesko's failure to testify because it suggested that Lesko had an obligation to address the charges against him. *Id.* at 1544–45. No such thing happened here. As the magistrate judge noted, while comments on what the defendant "failed to say may very well penalize a defendant for exercising his right to remain silent ... asking the jury whether the evidence presented of [Bates'] demeanor during trial shows remorse ... does not." *Bates v. Lee*, No. 1:99CV00742. Bates was not, of course, obligated to show remorse for his murder of Jenkins either before or during trial. However, the absence of any indication of contrition on his part for the taking of another human life was not beyond the range of prosecutorial

comment during sentencing. Since this court has already determined in *Howard* and *Gaskins* that comments referring to a defendant's demeanor during trial do not violate the Fifth Amendment, we find that the North Carolina courts' application of *Griffin* and *Doyle* was not unreasonable.

### B.

Next, Bates argues that the prosecutor's rhetoric at sentencing deprived him of a fair trial. Specifically, Bates argues that the prosecutor commented on the exercise of his right to counsel and his right to a jury trial in a manner which penalized him for exercising those rights. Furthermore, Bates argues that the prosecutor improperly discredited defense counsel in a way that also caused severe prejudice.

In considering Bates' argument, we first recognize that prosecutors enjoy considerable latitude in presenting arguments to a jury, *Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir.1990), because "the adversary system permits the prosecutor to 'prosecute with earnestness and vigor.'" *United States v. Young*, 470 U.S. 1, 7, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). Committed advocates do not always present antiseptic closing statements, and the jury is entrusted within reason to resolve such heated clashes of competing views. Moreover, the scope of our review is narrow, because "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (quoting *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)). Thus, our review is limited

to whether the comments rendered the proceeding so fundamentally unfair as to constitute a denial of due process. *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868. This determination requires us to look at "the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." *Boyd v. French*, 147 F.3d 319, 329 (4th Cir.1998) (internal quotation marks omitted).

Bates attacks the following portion of the prosecutor's argument:

> The Defendant sits here today with the benefit of, all the benefit we can give him that this system has to grant a person on trial. He gets all the ordinary benefits of this system, and it's not perfect, but it's as good as we could do. He sits here and he has this benefit. He has the benefit of a lengthy trial. He has the benefit of placing the burden of beyond a reasonable doubt on the shoulders of the State and say, "Here carry it. And, carry it straight up that mountain."
>
> . . .
>
> He's been given the benefit of two lawyers, two good lawyers, two good men, who will stand in a moment and talk to you, and ask you not to return the death penalty. That's their job.
>
> . . .
>
> Did [the victim] have a trial? . . . But, did, did [the victim] have the benefit of people getting up and begging for his life?

These comments did not run afoul of the due process clause. They were based upon facts established during trial or were aspects of the trial which were readily apparent to the jurors. That Bates had received the benefit of a lengthy trial and two good lawyers was obvious to ev-

eryone. And although we recognize the impropriety of a prosecutor vouching for a witness or impugning the ethics of defense counsel, we do not have that situation here. *See United States v. Moore*, 710 F.2d 157, 159 (4th Cir.1983)(noting that improper prosecutorial comment might mislead the jury into thinking the prosecution obtained extra-judicial information not available to the jury). Here, the prosecutor's comments were not misleading and thus not prejudicial either.

Even if we assumed arguendo that the prosecutor's comments at sentencing were improper, we cannot ignore the fact that Bates at no time objected to them. Moreover, the evidence of both the nature of the crime and the fact that Bates committed it was overwhelming. Given the indisputably gruesome circumstances attending the murder and the fact that Bates indisputably committed it, any denial of fundamental fairness from prosecutorial comments seems highly unlikely. *See, e.g., Bennett v. Angelone*, 92 F.3d 1336, 1345–47 (4th Cir.1996). The trial judge also instructed the jurors to consider the evidence for themselves rather than to rely on the arguments of the attorneys, thus curing any possible improprieties in the prosecutor's statements. Finally, the remarks were not pervasive, comprising only one and one half pages of the prosecutor's twenty-seven page argument. The North Carolina Supreme Court, "[a]fter carefully reviewing the prosecutor's argument in its entirety ... conclude[d] that it was not so grossly improper as to have necessitated intervention *ex mero motu* by the trial court." *State v. Bates*, 473 S.E.2d at 284. Under the circumstances, we cannot hold that this was an unreasonable application of clearly established federal law.

### V.

Bates argues finally that the jury instructions on the "heinous, atrocious or cruel" aggravating circumstance were vague and overbroad in violation of the Fifth, Eighth and Fourteenth Amendments. We also review this claim for whether the state court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *Williams v. Taylor*, 529 U.S. at 413, 120 S.Ct. 1495; 28 U.S.C. § 2254(d)(1).

 It has long been settled that a state's capital sentencing scheme must be tailored to avoid the arbitrary and capricious infliction of the death penalty. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Thus, a state must "define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'" *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (quoting *Gregg v. Georgia*, 428 U.S. 153, 196 n. 47, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). A state does so by providing "a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Gregg*, 428 U.S. at 188, 96 S.Ct. 2909 (quoting *Furman*, 408 U.S. at 313, 92 S.Ct. 2726 (White, J., concurring)).

 In the case of statutory aggravating circumstances in a capital punishment scheme, the Supreme Court has held that, standing alone, an instruction to determine whether the murder was "especially heinous, atrocious, or cruel," runs afoul of the Eighth Amendment prohibition against the imposition of cruel and unusual punishments. *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). However, an unconstitutionally vague statutory circumstance can be cured by an accompanying limiting instruction

which does provide sufficient guidance. *See Shell v. Mississippi*, 498 U.S. 1, 3, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) (Marshall, J., concurring); *Walton v. Arizona*, 497 U.S. 639, 653, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled in part by Ring v. Arizona*, —— U.S. ——, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Thus, since the Supreme Court has already determined that the "especially heinous, atrocious, or cruel" language alone violates the Eighth Amendment, we must now "determine whether the state courts have further defined the vague terms and, if they have done so, whether those definitions are constitutionally sufficient, i.e., whether they provide *some* guidance to the sentencer." *Walton*, 497 U.S. at 653, 110 S.Ct. 3047.

■ With these principles in mind, we turn to the instruction given by the trial court at the conclusion of the sentencing phase of Bates' trial. Under North Carolina law, a person may be sentenced to death if the jury finds, as an aggravating circumstance, that "the capital felony was especially heinous, atrocious, or cruel." N.C. Gen.Stat. § 15A–2000(e)(9) (2002). The trial court instructed the jury as follows:

> Was this murder especially heinous, atrocious or cruel?
>
> Now, ladies and gentlemen, in this context, heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile. And, cruel means designed to inflict a high degree of pain with utter indifference or even enjoyment of the suffering of others. However, it's not enough that this murder be heinous, atrocious or cruel, as those terms have just been defined to you, this murder must have been especially heinous, atrocious or cruel. And, not every murder is especially so.
>
> For this murder to have been especially heinous, atrocious or cruel, any brutality which [was] involved in it, must have exceeded that which is normally present in any killing ... or this murder must have been a conscienceless or pitiless crime, which was unnecessarily torturous to the victim.

This court recently considered an Eighth Amendment challenge to precisely the same aggravating circumstance instruction in *Fullwood v. Lee*, 290 F.3d 663 (4th Cir.2002). There, we concluded that the North Carolina Supreme Court's rejection of the challenge was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. *Id.* at 694. We further noted that this court had recently rejected that argument in two other capital cases involving the same North Carolina statutory aggravating circumstance. *Id.* (citing *Fisher v. Lee*, 215 F.3d 438, 457–59 (4th Cir.2000), and *Frye v. Lee*, 235 F.3d 897, 907–08 (4th Cir.), *cert. denied*, 533 U.S. 960, 121 S.Ct. 2614, 150 L.Ed.2d 769 (2001)). Given our recent consideration of this issue, we reiterate that the North Carolina Supreme Court decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

## VI.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*