390 F.3d 823
 UNITED STATES of America, Plaintiff-Appellee,
v.
James Anthony SAVAGE, a/k/a Mario J. Racanelli, a/k/a John Anthony Savage, a/k/a Egisto Grandoni, a/k/a Max Marrache, a/k/a Greg Masonotti, a/k/a M. John Delano, a/k/a Robert Toliano, a/k/a Grandoni Egistot, a/k/a Mark Racanelli, a/k/a John Racanelli, Defendant-Appellant.
 No. 02-4576.
 United States Court of Appeals, Fourth Circuit.
 Argued: October 1, 2004.
 Decided: December 10, 2004.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: Peter David Goldberger, Ardmore, Pennsylvania, for Appellant. Douglas Cannon, Assistant United States Attorney, Office of the United States Attorney, Greensboro, North Carolina, for Appellee. ON BRIEF: Pamela A. Wilk, Ardmore, Pennsylvania, for Appellant. Anna Mills Wagoner, United States Attorney, Clifton T. Barrett, Assistant United States Attorney, L. Patrick Auld, Assistant United States Attorney, Greenboro, North Carolina, for Appellee.
 Before NIEMEYER, MOTZ, and KING, Circuit Judges.
 Affirmed by published opinion. Judge King wrote the opinion, in which Judge Niemeyer and Judge Motz joined.
 KING, Circuit Judge:
 
 
 1
 Appellant James A. Savage was convicted in the Middle District of North Carolina in March of 2002 on multiple fraud-related charges in a thirty-two count indictment. His convictions include fourteen counts of wire and mail fraud, in violation of 18 U.S.C. §§ 1341 and 1343; ten counts of interstate transportation of stolen property, in contravention of 18 U.S.C. § 2314; six counts of money laundering, in violation of 18 U.S.C. § 1957(a); and two counts of conspiracy, in contravention of 18 U.S.C. §§ 371 and 1956(h). On appeal, Savage raises four issues, most significantly challenging his money laundering convictions on the basis that the court impermissibly amended the indictment. As explained below, we affirm.
 
 I.
 A.
 
 2
 The factual scenario underlying the array of offenses lodged against Savage primarily related to his scheme to defraud several investors — mainly single, older women — of substantial sums of money, by inducing them to invest in bogus business ventures (first, wireless communication operations, and later, uncut gems from overseas). After securing large sums of money from his fraudulent activities, Savage spent most of it on personal extravagances. In carrying out his fraudulent activities, Savage presented himself to his victims under various aliases, particularly "Mario Racanelli," and he frequently affected a mafia-type persona. He consistently advised his victims of far-fetched and untrue stories about his family and businesses. In sum, ten of Savage's victims collectively suffered losses of over $8,000,000.
 
 
 3
 In 1995 and 1996, operating primarily in North Carolina, Savage met and romanced Connie Steinberg, Ellen Shlom, Rose Barron, and Jule White. Steinberg invested $1,500 with Savage for a supposed wireless communications venture. He also ran up $12,000 of debt on Steinberg's credit cards without her knowledge. Shlom invested $2,500 with Savage for the same venture and also gave him $2,200 from an advance on her credit card. Barron invested $3,200 with Savage for the same venture. Finally, White obtained a $5,000 advance on her credit card and invested the money with Savage. None of the women recovered any of their principal or the expected return on their "investments."
 
 
 4
 In 1999, Savage met fifty-nine-year-old Marsha Cox in Florida. He romanced Cox and persuaded her to purchase a $3,000 computer for him. Cox was also persuaded to allow Savage to float large checks through her bank accounts in order to launder his ill-gotten funds. When some of his victims became suspicious of Savage's activities or threatened to report him to the authorities, Savage intimidated them. For example, he advised Barron that she was constantly being watched and that she "didn't realize the contacts he had." When White wanted to go to the police, he threatened that he would "take care of [her]."
 
 
 5
 The primary victim of Savage's fraudulent activities was Jean Foster, whom he swindled out of more than $6,000,000. Foster first met Savage in 1996 at a ballroom dancing activity in Winston-Salem, North Carolina; she was then sixty-five and Savage was in his late twenties, though he told her he was forty-one. The two became intimate and, over the next two and one-half years, Savage completely depleted Foster's net worth. Foster lost the funds in her trust accounts and most of her jewelry to Savage, and she then sold her residence to provide him with additional money. Foster finally went to the police and an attorney in August 1999, and she then ceased giving Savage money and began recording their phone conversations. Foster's testimony at trial, along with her recordings, constituted important evidence for the prosecution.
 
 
 6
 In 1999, Savage expanded his fraudulent activities and began to offer his victims false investment opportunities in diamond and emerald importation and cutting. Savage and his then-wife, Margaret Handsman,[1] convinced Glenn and Sheri Huminski to invest $205,000 in his gem scheme after the Huminskis mortgaged their home. The Huminskis then convinced a friend, Glenn Whitfield, to invest an additional $75,000 with Savage. Savage persuaded Jennifer Stack to invest $900,000 in uncut emeralds; he also convinced Stack's psychotherapist, Sharon Taft, to invest $360,000. Finally, Geri Black, a widow, invested $600,000 in Savage's gem importation scheme. Interestingly, Savage once repaid Stack the sum of $20,000. He never returned any principal or expected profits to his other victims.
 
 
 7
 In 2000, two Winston-Salem attorneys, Reginald Combs and Joslin Davis, were paid legal fees by Savage and Handsman for representation in a civil action initiated by Foster. The source of the money used for these payments was Savage's fraudulent activities. Six of these payments resulted in bank deposits of more than $10,000 — two checks, two groups of money orders, and two wire transfers into law firm bank accounts — occurring between February and December 2000. These transactions constituted the underpinnings of the six money laundering counts of the indictment, set forth in Counts Twenty-Six through Thirty-One (the "money laundering counts").
 
 B.
 
 8
 On December 17, 2001, a grand jury in the Middle District of North Carolina indicted Savage and Handsman for thirty-two offenses arising from their fraudulent activities.[2] Handsman pleaded guilty to one count of money laundering conspiracy (Count Thirty-Two) on March 7, 2002, and the other charges against her were later dismissed in exchange for her cooperation and testimony against Savage.
 
 
 9
 At trial, the prosecution introduced evidence of three answering machine messages that Savage had left for Handsman after she had agreed to testify for the prosecution.[3] In these messages, Savage threatened Handsman's life, warned her to be careful when starting her car, and directed a number of expletives at her. Handsman also testified at trial to a sexual incident between her and Savage in which he had dressed up as Jean Foster. The defense lodged proper and timely objections to each of these items of evidence.
 
 
 10
 The prosecution also introduced evidence surrounding two incidents in Florida, occurring in the course of the conspiracy, when Savage was arrested. In the first incident, occurring near Miami on March 8, 2000, the police arrested Savage and recovered over $12,000 in cash plus several items relating to false identifications. When Savage objected to this evidence, the court instructed the jury that the evidence was only admitted for the purpose of whether the items recovered were tools and materials which had been used in the conspiracy. Otherwise, according to the limiting instruction, the arrest was not evidence of Savage's guilt and "had nothing to do with the matter in this case." Savage made no objection to this limiting instruction.
 
 
 11
 In the second incident, occurring near Sarasota on March 24, 2000, Savage was arrested while seeking to conceal himself from officers who were executing a search warrant for his person. The prosecution first presented evidence relating to the Sarasota arrest through testimony of a police officer involved in executing the warrant. On objection by Savage, however, this evidence was stricken by the court for lack of relevance or materiality. During Handsman's subsequent testimony as a cooperating Government witness, evidence was again presented concerning the Sarasota arrest incident. When Savage objected to her evidence concerning this incident, the court overruled the objection. Savage made no request for a limiting instruction as to this evidence, and none was given.
 
 
 12
 During his closing argument, the prosecutor described the evidence against Savage as telling a "sordid and sad tale," and asserted that Savage had used romance to weaken the judgment of his several female victims. The prosecutor also urged the jurors to focus on the credibility of the prosecution witnesses, regardless of the jurors' sympathy, or lack thereof, for those witnesses. Finally, he argued that Savage "lost his good name, by whatever alias you choose" and that he does not "feel that compulsion others do." Savage made no objection to the prosecutor's closing argument.
 
 
 13
 Prior to the its deliberations, the court provided instructions to the jury on the applicable legal principles. On the money laundering counts, the court advised the jury, inter alia, that the prosecution was required to prove, beyond a reasonable doubt, that Savage had engaged "in a monetary transaction of criminally derived money of a value of greater than $10,000." The court then instructed the jury, by reading the pertinent part of 18 U.S.C. § 1957(f)(1), that a "monetary transaction," as used in the indictment, is "the deposit, withdrawal, transfer or exchange ... of funds or monetary instruments by, through, or to a financial institution."
 
 
 14
 On March 21, 2002, after a six-day trial, Savage was convicted on all counts. In his sentencing proceedings on July 25, 2002, the district court applied a two-level enhancement to Savage's base offense level for his violation of an earlier court order. See U.S.S.G. § 2F1.1(b)(4)(C) (2000). The basis of this enhancement was Savage's violation of an injunction order entered in Foster's civil action, in the Middle District of North Carolina, prohibiting Savage from "disposing of, encumbering, and depleting any interest in any assets" owned by him. Despite that order, Savage had transferred more than $2,000,000 worth of personal property and liquid assets, some to known associates and some to a storage unit, in an effort to evade the civil judgment against him. At the conclusion of the sentencing proceedings, the district court sentenced Savage to 250 months of imprisonment.
 
 II.
 
 15
 On appeal, Savage raises four contentions of error. First, he maintains that the trial court erred in admitting the evidence of his phone messages to Handsman, testimony regarding his sexual behavior with Handsman, and the evidence surrounding his earlier arrests in Miami and Sarasota. Second, he asserts prosecutorial misconduct by an improper and prejudicial closing argument. Third, Savage contends that the instructions on the money laundering counts impermissibly broadened the bases for conviction alleged in the indictment. Finally, Savage maintains that the trial court erred in enhancing his base offense level for violation of a court order.[4]
 
 A.
 
 16
 Savage first asserts that the district court erred in admitting four items of evidence — answering machine messages, a sexual incident with his wife, and the events relating to his two prior arrests — because the probative value of each was substantially outweighed by the danger of unfair prejudice. See Fed.R.Evid. 403. A decision on the admission of evidence is peculiarly within the province of the trial court, and we review such a decision for abuse of discretion. United States v. Aramony, 88 F.3d 1369, 1377 (4th Cir.1996). Moreover, even if evidence has been erroneously admitted, we review the trial court's ruling for harmless error. United States v. Francisco, 35 F.3d 116, 118 (4th Cir.1994).
 
 
 17
 First, as the district court observed, the answering machine messages were relevant evidence against Savage, as they constituted threats against a prosecution witness, indicating a consciousness of guilt. See United States v. Van Metre, 150 F.3d 339, 352 (4th Cir.1998). As the district court also observed, the phone messages were relevant to establishing that Savage and Handsman had conspired to defraud their victims. Accordingly, there was no abuse of discretion in the trial court's ruling on this evidence.
 
 
 18
 Second, although Handsman's testimony regarding the sexual incident could have engendered some degree of distaste among the jurors, it was relevant to show Handsman's knowledge of Savage's fraudulent activities with respect to Foster, supporting the prosecution's proof of an ongoing conspiracy. Because of its relevance, and viewed in context, this evidence was not unfairly prejudicial to Savage, and it did not create "a genuine risk that the emotions of the jury [were] excited to irrational behavior." United States v. Ham, 998 F.2d 1247, 1252 (4th Cir.1993) (citation and internal quotation marks omitted).[5] Accordingly, there was no abuse of discretion in the trial court's admission of this evidence.
 
 
 19
 The evidence relating to the Miami arrest incident was also not erroneously admitted, when assessed in the context of trial.[6] The trial court properly exercised its discretion in admitting the evidence for limited purposes only, and it provided the jury with an appropriate limiting instruction, which included, inter alia, the admonition that the arrest of Savage was not evidence of his guilt. See Francisco, 35 F.3d at 119 (observing that jury is presumed to follow instructions). On appeal, Savage does not contest the sufficiency of this limiting instruction, to which he lodged no objection at trial. In these circumstances, Savage's contention of error with respect to the evidence of the Miami arrest is without merit.
 
 
 20
 Finally, while we see the admission of Handsman's testimony regarding Savage's Sarasota arrest as a closer question, the trial court's ruling hardly qualifies as an abuse of its broad discretion in such matters.[7] See United States v. Russell, 971 F.2d 1098, 1104-05 (4th Cir.1992)(observing that trial court's evidentiary rulings are entitled to substantial deference). In any event, such an error would be harmless in the context of this trial. In view of the overwhelming nature of the proof against Savage, we are convinced that the verdict "was not substantially swayed" against him by the admission of this evidence.[8] Brooks, 111 F.3d at 371 (citation and internal quotation marks omitted). Accordingly, we also reject Savage's contention with respect to his Sarasota arrest.
 
 B.
 
 21
 Savage next maintains that the prosecutor engaged in misconduct by referring to Savage's character and playing to the jury's emotions during closing argument. We review this claim for plain error, however, as Savage made no contemporaneous objection to the prosecutor's argument. United States v. Ollivierre, 378 F.3d 412, 417-18 (4th Cir.2004) (citing United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).[9]
 
 
 22
 Assessed carefully under the first prong of Olano (whether there was error), we are unable to identify any misconduct or erroneous actions in the prosecution's closing argument. As we have recognized, "[c]ommitted advocates do not always present antiseptic closing statements," and an appellate contention concerning the propriety of a closing argument must be examined in that vein. Bates v. Lee, 308 F.3d 411, 422 (4th Cir.2002). And as we have often observed, "prosecutors enjoy considerable latitude in presenting arguments to a jury, because the adversary system permits the prosecutor to prosecute with earnestness and vigor." Id. (internal citations and quotations omitted). Our assessment of the prosecutor's argument in Savage's trial, examined in context, fails to disclose any misconduct or error and, as a consequence, Savage's contention on this point must also be rejected.
 
 C.
 1.
 
 23
 In seeking a new trial on the money laundering counts, Savage complains on appeal that the instructions impermissibly amended those counts, authorizing the jury to convict him on the basis of allegations which had not been charged by the grand jury. See Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) (recognizing that right to be tried only on charges lodged by grand jury is violated when instructions broaden possible bases of conviction). More specifically, Count Twenty-Six charged, in pertinent part, that Savage had "knowingly engaged in a monetary transaction affecting interstate commerce ... in criminally derived property of a value of over $10,000 ... by causing the deposit of twenty thousand dollars ($20,000) into a Winston-Salem, North Carolina law firm's bank account" in violation of 18 U.S.C. § 1957(a).[10] (emphasis added). The other five money laundering counts contained identical allegations, except for the dates and sums of the deposits.
 
 
 24
 At the close of the evidence, the court instructed the jury on the applicable legal principles. Certain of the instructions, to which Savage consented, related to the money laundering counts. They required, inter alia, that the prosecution prove, beyond a reasonable doubt, that Savage had engaged "in a monetary transaction of criminally derived money of a value of greater than $10,000." (emphasis added). Consistent with § 1957(f)(1) of Title 18, the court explained the money laundering offenses by also instructing the jury that a "monetary transaction" means "the deposit, withdrawal, transfer or exchange, in or affecting interstate commerce of funds or monetary instruments by, through, or to a financial institution." (emphasis added). When the jury was preparing to deliberate, the court provided it with a copy of the indictment.
 
 
 25
 Savage contends that these instructions served to constructively amend the six money laundering counts by authorizing his conviction for monetary transactions other than those charged by the grand jury, specifically for the "withdrawal, transfer, or exchange" of funds, while the indictment had limited the six monetary transactions to the "deposit" of criminally derived monies. Because there was no objection to these instructions, we review this contention for plain error only. Fed.R.Crim.P. 52(b); Olano, 507 U.S. at 732, 113 S.Ct. 1770.
 
 2.
 
 26
 Assessed under United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), we are unable to identify any error here, and the money laundering instructions thus were not plainly erroneous. The money laundering counts simply charged Savage with conduct prohibited by the statute, and they properly framed each charge "in the words of the statute." United States v. Wicks, 187 F.3d 426, 427 (4th Cir.1999) (holding that indictment is sufficient if it alleges offense in language of statute). Each of the money laundering counts properly alleged that Savage, under § 1957(a), had knowingly engaged in a "monetary transaction" in criminally derived property valued over $10,000. The grand jury then particularized the monetary transactions underpinning those offenses as six specific bank deposits.
 
 
 27
 The trial court properly instructed the jury on the elements of § 1957(a), including the requirement that the jury find, beyond a reasonable doubt, that Savage had engaged "in a monetary transaction." Savage does not contend on appeal that § 1957(a) is either vague or ambiguous. See Rimerman v. United States, 374 F.2d 251, 254-55 (8th Cir.1967) (instructing jury in language of statute is appropriate when statutory provision is clear and concise) Wheeler v. United States, 190 F.2d 663, 663 (D.C.Cir.1951) (same); 2 Charles Alan Wright, Federal Practice and Procedure §§ 485, 487, at 712 & n.6, 729 & n.15 (2d. ed. 1982 & Supp.1999) (collecting cases). Moreover, the court then appropriately instructed the jury on the statutory definition of a "monetary transaction," as it is set forth in § 1957(f)(1), that is, "the deposit, withdrawal, transfer, or exchange ... of funds." That aspect of the instructions properly served to explain the monetary transaction element of the money laundering offenses, including the fact that proof of a bank deposit would satisfy that element of such an offense.
 
 
 28
 Notwithstanding Savage's protestations, it is of no moment that the money laundering counts alleged only that Savage had deposited the criminally derived monies. And the instructions complained of did not identify a separate or different offense from that alleged in those counts. As a result, the jury could not have convicted Savage of any crimes other than those alleged. See United States v. Downer, 143 F.3d 819, 822 (4th Cir.1998) (finding constructive amendment when trial court substituted another offense for that charged in indictment); United States v. Floresca, 38 F.3d 706, 710 & n. 9 (4th Cir.1994) (en banc) (finding constructive amendment when trial court instructed jury it could convict under either of two statutory subsections but only one charged in indictment). In these circumstances, there was nothing erroneous in the money laundering instructions, and Savage's contention on this point must also be rejected.
 
 D.
 
 29
 Savage's final contention is that the district court erred in enhancing his base offense level under the Sentencing Guidelines for his violation of the injunction order entered in Foster's civil action. See U.S.S.G. § 2F1.1(b)(4)(C) (2000) (providing for two-level enhancement where the offense involves "a violation of any prior, specific judicial or administrative order, injunction, decree, or process"). We review a district court's factual findings at sentencing for clear error and its application of the Guidelines de novo. United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir.1989). Savage's actions—transferring assets to storage and to his associates— plainly constituted an effort to hide those assets from the court, in violation of the court's order enjoining him from "disposing of, encumbering and depleting any interest in any assets." The sentencing court's findings in this regard are not clearly erroneous, and its application of the Guidelines was entirely proper. Accordingly, we must deny relief on this claim as well.
 
 III.
 
 30
 Pursuant to the foregoing, we reject Savage's contentions of error and affirm his convictions and sentence.
 
 
 AFFIRMED
 
 
 
 Notes:
 
 
 [1]
 Margaret Handsman was Savage's wife during most of the fraudulent activities for which he was prosecuted. Handsman testified at trial that she met Savage in early 1996, married him in July of that year, left him in October 2000, and divorced him in June 2001
 
 
 [2]
 Count Twenty-Six of the indictment, by way of example, alleged in pertinent part as follows:
 On or about April 4, 2000, in the County of Forsyth, in the State and Middle District of North Carolina, JAMES ANTHONY SAVAGE and MARGARET NATHALIE HANDSMAN, defendants herein, together and with divers other persons to the Grand Jurors both known and unknown, knowingly engaged in a monetary transaction affecting interstate commerce, by, through and to a financial institution, in criminally derived property of a value of over $10,000, derived from specified unlawful activity, namely mail fraud and wire fraud, and inducing the travel of persons in interstate commerce in the execution of a scheme to defraud, by causing the deposit of twenty thousand dollars ($20,000) into a Winston-Salem, North Carolina law firm's bank account, BB & T account number 5118542098.
 All in violation of Title 18, United States Code, Sections 1957(a) and 2.
 Counts Twenty-Seven through Thirty-One differed from Count Twenty-Six only with respect to their allegations of different monetary transactions occurring on other occasions.
 
 
 [3]
 In addition to the admission of these three taped messages, a fourth such tape was offered by the Government but was excluded by the court as being overly prejudicial
 
 
 [4]
 By unpublished per curiam opinion filed on December 5, 2003, we initially affirmed Savage's convictions and sentenceUnited States v. Savage, 82 Fed.Appx. 82, 2003 WL 22871605 (4th Cir.2003). Savage subsequently petitioned for rehearing, specifically on the instructions relating to the money laundering counts. We granted rehearing on February 9, 2004, vacating our earlier opinion. See Local Rule 40.2. Each of Savage's contentions is now before us.
 
 
 [5]
 There is likewise no merit to Savage's argument that the sexual incident was protected by privilege as a confidential marital communication. Although Savage and Handsman were married when the communication was made, they were jointly involved in ongoing criminal activity to defraud Foster and othersSee United States v. Parker, 834 F.2d 408, 412 n. 7 (4th Cir.1987) (recognizing that communications between spouses that "are in any way related to a crime, and made in the course of the spouses' joint planning or participation in that crime" are excluded from protection by marital privilege).
 
 
 [6]
 While evidence of unrelated arrests are not normally admissible against a criminal defendant, a trial court possesses broad discretion, under Federal Rules of Evidence 404(b) and 403, to admit evidence which is inextricably intertwined with proof of the offenses for which an accused is on trial. Falling outside the scope of Rule 404(b), evidence of an arrest for activity "other than the offense charged ... is not extrinsic evidence if it is inextricably intertwined with the evidence of the charged offense."United States v. Cancelliere, 69 F.3d 1116, 1124 (11th Cir.1995).
 
 
 [7]
 It is significant in our assessment of the Sarasota arrest evidence that the warrant being executed was a Florida search warrant for Savage's person directed to a residential property titled in Handsman's name. This residence, which was being paid for by Savage, was equipped with a hidden room where surveillance cameras, located throughout the property, were used to monitor activities in and about the residence. The district court aptly described the secret room as "an area... similar to some of the old movie stories that you sometimes see of old and unusual houses, though this was a new one, with a wall that would reverse itself." It was in this hidden room, on the second floor of the residence, that Savage was discovered by the officers "in his shorts." Handsman, his confessed co-conspirator, had earlier represented to the officers that she did not know whether or not Savage was on the property. In such circumstances, the trial court was within its discretion in ruling as it did
 
 
 [8]
 In order for a trial error to be harmless, "we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [verdict] was not substantially swayed by the error."United States v. Brooks, 111 F.3d 365, 371 (4th Cir.1997) (citation and internal quotation marks omitted).
 
 
 [9]
 The plain error mandate ofOlano is satisfied if: (1) there was error; (2) it was plain; and (3) it affected the defendants' substantial rights. 507 U.S. at 732, 113 S.Ct. 1770. If these conditions are met, we may then exercise our discretion to notice the error, but only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. (citation and internal quotation marks omitted).
 
 
 [10]
 Pursuant to § 1957(a) of Title 18, "[w]hoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punishable as provided in subsection (b)."